**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

**CHRISTOPHER SHORTER,**                    **Case No. 4:19-CV-108-WS-CAS**

     **Plaintiff,**

**v.**

**WILLIAM B. BARR, in his Official Capacity as the**
**Attorney General of the United States and**
**Director of the United States Department of Justice,**
**IAN CONNORS, in his Individual Capacity as the**
**National Inmate Appeals Administrator of the**
**Federal Bureau of Prisons, JOHN DOE 1 and**
**JOHN DOE 2, in their Individual Capacities,**
**As Members of the Transgender Clinical Care Team,**
**Federal Bureau of Prisons,**

     **Defendants.**
_____/

## SECOND AMENDED COMPLAINT

Plaintiff Christopher Shorter ("Plaintiff"), sues WILLIAM B. BARR, in his

Official Capacity as the Attorney General of the United States and Director of the

United States Department of Justice, IAN CONNORS, in his Individual Capacity as

the National Inmate Appeals Administrator of the Federal Bureau of Prisons, JOHN

DOE 1 and JOHN DOE 2, in their Individual Capacities, as Members of the

Transgender Clinical Care Team, Federal Bureau of Prisons as follows:

1

## INTRODUCTION

1.      This case is about an individual who was in the process of transitioning gender roles when she[1] was incarcerated in Federal Bureau of Prisons (BOP) facilities.  Thereafter, despite the need for treatment, she was denied medically necessary treatment for her Gender Dysphoria while in custody of the BOP from on or around February 9, 2012 to February 14, 2019. Plaintiff brings this action for damages due to the Defendants' failure to accommodate her and the failure to treat her disability and serious medical needs consistent with their obligations under the Eighth Amendment to the United States Constitution and the Rehabilitation Act of 1973 ("RA"), 29 U.S.C § 794.

2.      This action seeks monetary, equitable and injunctive relief to redress the Defendants' violation of her constitutional and statutory rights in excess of Seventy-Five Thousand Dollars ($75,000.00).

## JURISDICTION AND VENUE

3.      Plaintiff brings this action pursuant to the Eighth Amendment of the United States Constitution pursuant to *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971), and the RA.

---

[1] Female pronouns are being used.

4.     This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3) (civil rights).

5.     Venue is proper in the Northern District of Florida under 28 U.S.C. § 1391(e) because the Plaintiff resides in this District.

## PARTIES

6.     Ms. Shorter is 41 years old and was serving a 96-month sentence in the custody of the BOP at the time of the events alleged herein.  She is a resident of the geographical area covered by the Northern District of Florida and is *sui juris.*

7.     Defendant, William Barr, is sued in his official capacity as the Attorney General of the United States.  Defendant Barr is the most senior official in the U.S. Department of Justice ("DOJ") and the BOP, and has the authority to interpret the laws and policies for individuals incarcerated in the BOP, including those concerning medical procedures.  Barr has BOP facilities operating within the jurisdictional boundaries of this Court.

8.     Defendant, Ian Connors, is being sued pursuant to *Bivens* in his individual capacity as the National Inmate Appeals Administrator of the BOP. Defendant Connors was aware of the Plaintiff's claims, knew that her surgery was medically necessary but nevertheless denied all remedies and appeals allowing the Plaintiff to suffer by not receiving the medically necessary treatment for her Gender

Dysphoria, including facility reassignment and gender affirming surgery.   All appeals were unreasonably denied.  Each denial of each appeal referenced below was done by Connors and/or his designee.

9.     Defendants John Doe #1 and John Doe #2, are being sued pursuant to *Bivens* in their individual capacities, as members of the Transgender Clinical Care Team ("TCCT") of the BOP.  These Defendants actively and constructively denied Ms. Shorter's surgery requests since February 2017 contrary to her doctors' recommendations in order to treat Ms. Shorter's gender dysphoria. In addition, these Defendants, together with the other Defendants, denied Plaintiff's request to transfer to a female institution. The TCCT repeatedly ignored accepted standards of care by delaying and denying the prescribed treatment, thereby exhibiting deliberate indifference to her medical needs, and prolonging her mental suffering without any legitimate purpose.

10.     Defendants denied Plaintiff's request for treatment for her Gender Dysphoria even though they knew that such treatment was medically necessary and that Ms. Shorter was at substantial risk of serious harm if she did not receive it.

## GENERAL ALLEGATIONS

### A.      Gender Dysphoria

11.     "Gender identity" is a well-established medical concept, referring to a person's internal sense of their own gender.

12.    Gender identity is innate and immutable.

13.    Typically, people who are designated female at birth based on their external anatomy identify as girls or women, and people who are designated male at birth identify as boys or men.

14.    For transgender individuals, however, one's gender identity differs from the sex assigned to them at birth. Transgender men are men who were assigned "female" at birth but have a male gender identity. Transgender women are women who were assigned "male" at birth but have a female gender identity.

15.    The medical diagnosis for the incongruence between one's gender identity and one's sex assigned at birth and the clinical distress resulting from this incongruence is Gender Dysphoria (previously known as Gender Identity Disorder).

16.    Gender Dysphoria is a serious medical condition codified in the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition ("DSM-5") and International Classification of Diseases-10 ("ICD-10").[2]

---

[2] The DSM-5 describes the criteria as follows:

Gender Dysphoria in Adolescents and Adults 302.85 (F64.1)

A.  A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least two of the following:
    1.  A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in

17.    If left untreated, Gender Dysphoria can lead to serious medical problems, including clinically significant psychological distress, dysfunction, debilitating depression, and, for some people without access to appropriate medical care and treatment, self-harm, suicidality, and death.

18.    Leading medical and mental-health professional groups—including the American Medical Association, the American Psychological Association, the American Psychiatric Association, the American Academy of Family Physicians, the American Congress of Obstetricians and Gynecologists, the Endocrine Society, the National Association of Social Workers, and the World Professional Association for Transgender Health—all agree that Gender Dysphoria is a serious

---

young adolescents, the anticipated secondary sex characteristics).
2. A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics).
3. A strong desire for the primary and/or secondary sex characteristics of another gender.
4. A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).
5. A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).
6. A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).
B. The condition is associated with clinically significant distress or impairment in social, occupation, or other important areas of functioning.

DSM-5 at 452-53.

medical condition, and that treatment for Gender Dysphoria is medically necessary for many transgender people.

19.    The accepted standards of care for treating Gender Dysphoria are published by the World Professional Association for Transgender Health ("WPATH"), a professional association dedicated to establishing the standards for treating Gender Dysphoria.

20.    The WPATH Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People ("Standards of Care") identify clinical guidance for health professionals to assist with safe and effective care for individuals with Gender Dysphoria. The current version of the Standards of Care—Version 7—was released in September 2011.[3]

21.    The WPATH Standards of Care are recognized by the leading medical and mental-health professional groups as the authoritative standards for treating Gender Dysphoria.

22.    The Standards of Care apply equally to inmates, and expressly state:

Health care for transsexual, transgender, and gender-nonconforming people living in an institutional environment should mirror that which would be available to them if they were living in a non-institutional setting within the same community. . . . All elements of assessment

---

[3] Eli Coleman et al., Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People, Version 7, 13 Int'l J. of Transgenderism 165 (2011), https://www.wpath.org/media/cms/Documents/SOC%20v7/Standards%20of%20Care_V7%20Full%20Book_English.pdf (visited July 23, 2019).

and treatment as described in the SOC can be provided to people living in institutions. Access to these medically necessary treatments should not be denied on the basis of institutionalization or housing arrangements. If the in-house expertise of health professionals in the direct or indirect employ of the institution does not exist to assess and/or treat people with gender dysphoria, it is appropriate to obtain outside consultation from professionals who are knowledgeable about this specialized area of health care.[4]

23.   The National Commission on Correctional Healthcare ("NCCHC") recommends that the medical management of prisoners with gender dysphoria "should follow accepted standards developed by professionals with expertise in transgender health," citing the WPATH Standards of Care.[5]

24.   Under the WPATH Standards of Care, treatment for Gender Dysphoria is designed to help individuals live congruently with their gender identity and thus eliminate the clinically significant distress. Treatment protocols include socially transitioning (dressing, grooming, and presenting oneself to others in accordance with one's gender identity), hormone therapy, and surgeries. The particular course of medical treatment varies based on the individualized needs of the person.

**B.   Plaintiff's Gender Dysphoria**

---

[4] *Id.* At 206-07.
[5] NCCHC Policy Statement, Transgender Health Care in Correctional Settings (October 18, 2009; reaffirmed with revision April 2015), http://www.ncchc.org/transgender-health-care-in-correctional-settings   (visited July 23, 2019) (footnote omitted).

25.     Plaintiff was born as a male.  She is and has been transitioning as a female.  She is currently 41 years old.

26.     Plaintiff has known that she has a female gender identity since her childhood.

27.     In 2008, Plaintiff began living full-time as a woman and going by the name of "Chrissy" among her friends and family to live more harmoniously with her female gender identity.  She also started hormone therapy.  This treatment included estrogen and suppressed her production of testosterone.

**C.     Plaintiff's Incarceration and Denial of Medically Necessary Care**

28.     On or around February 9, 2012, Plaintiff was received into the custody of the Federal Bureau of Prisons to begin her sentence. She began her sentence at Jesup-Federal Correctional Institution in Georgia and was later transferred to Oakdale-Federal Correctional Institution ("FCI Oakdale") in Louisiana.

29.     On October 2, 2014, Plaintiff was diagnosed with Gender Dysphoria by Dr. Barbara Moorehead, the chief psychologist at FCI Oakdale.  Plaintiff was referred to medical and psychiatry within FCI Oakdale to establish a care plan for Gender Dysphoria.  Dr. Moorehead noted of the session:

> He produced laminated pictures and an album which he said helps to ground his self-concept while he is in this prison environment where it is difficult to dress and present himself comfortably as he had before incarceration. He also said that for seven years, he had been taking the over-the-counter hormones to alter his features

from more masculine to feminine appearance.  His mannerisms are more consistent with females than males and his interests and associations are similarly more feminine than masculine.

30.    On December 15, 2014, Plaintiff presented to BOP health services to establish a treatment plan for Gender Dysphoria.  She indicated she wanted to begin treatment of testosterone blockers and estrogen patches as she had prior to being incarcerated.  Dr. Alexandre prescribed Spironolactone, a testosterone blocker.

31.    On May 29, 2015, Defendant Barr, through the BOP and DOJ, approved estrogen therapy.  On June 4, 2015, Plaintiff was prescribed the Estradiol patch. She began estrogen therapy for her Gender Dysphoria when she received her first patch on June 17, 2015.

32.    On January 4, 2016, Plaintiff was transferred to Miami Federal Correctional Institution ("FCI Miami").

33.    On April 4, 2016, Dr. Todd Cornett, Psychiatrist, requested a consultation for Plaintiff with Dr. Eugenio Angueria-Serrano, Endocrinologist.

34.    On April 19, 2016, Dr. Inerio Alarcon, at FCI Miami, examined the Plaintiff at which time she informed the doctor of a lump in her right breast and an ultrasound was ordered.  This is significant to the issue of whether Plaintiff was properly taking, and should be continued on, estrogen therapy, as discussed below.

35.    On April 26, 2016, Plaintiff was referred to Dr. Torres at BOP

psychology services FCI Miami for a suicide risk assessment given that her feelings of dysphoria were intense and causing "suicidal ideation, emotional distress, excessive preoccupation with genital mutilation, and self-castration."  Dr. Torres concluded that a suicide watch was unwarranted but to continue care under the increased care level of "Care2-MH" because Plaintiff had an extensive history of suicide attempts.

36.    Later that day, Plaintiff was referred to Dr. Torres for another suicide risk assessment.  Plaintiff reported that she filed complaints against medical staff because she did not feel she was receiving adequate medical care for Gender Dysphoria.  The Plaintiff denied having any suicidal ideations, intent, or plans, and stated, "I want to live, I just can't tell you what will happen in one year from now if I still have testicles and no breasts."

37.    Plaintiff denied engaging in genital mutilation and/or attempting self-castration, though admitted the thoughts did cross her mind. Plaintiff also stated she wanted surgery because of the risk of developing cancer from the hormone replacement therapy given her family history of breast cancer.

38.    On May 9, 2016, Plaintiff met with Dr. Alarcon to request discontinuation of hormonal therapy because she was not seeing any breast growth.  She asked for alternative treatment, to include castration.  Dr. Alarcon prescribed Medroxyprogesterone to facilitate breast growth, consistent with WPATH standards.

39.    On May 13, 2016, Dr. Angueira-Serrano examined the Plaintiff and increased her Spironolactone and Estradiol consistent with WPATH standards.

40.    On May 24, 2016, Plaintiff underwent a breast ultrasound which confirmed a right breast mass.  Surgical consultation and a biopsy were recommended.

41.    On August 25, 2016, Plaintiff underwent another breast ultrasound, mammogram, and bone density study at Larkin Hospital.  The following day, Dr. Martha Chipi examined Plaintiff and noted the results were not yet available, but a surgical consult for further evaluation would happen soon.  Two of the Plaintiff's sisters passed away in their 30s due to breast cancer which caused Plaintiff to be concerned.

42.    On September 22, 2016, Plaintiff returned to Larkin Hospital for a right breast lumpectomy with reconstruction.  During a following up on October 13, 2016, the doctor explained the results as follows:  the "mass was negative for malignancy" but "positive for lobular hyperplasia, which is not usually seen with gynecomastia."

43.    On November 17, 2016, Plaintiff was treated at Jackson Hospital in the Miami area for chest pains associated with her hormone therapy.

44.    On December 12, 2016, Plaintiff discontinued Estradiol and Medroxyprogesterone therapy due to complications.  Plaintiff was contraindicated from further hormone therapy consistent with the Endocrine Society Clinical Practice Guidelines and WPATH standards of care.

45.    On February 15, 2017, the BOP Chapel referred Plaintiff to BOP's psychology services stating that Plaintiff expressed a desire to commit self-castration in an effort to commit suicide. During the evaluation, Dr. Torres noted that Plaintiff discontinued the hormone therapy due to increased adverse effects.  Plaintiff expressed to Dr. Torres during this visit that she had suicidal thoughts over the past four days, the result of feeling hopeless after being notified that the appointment for the transgender endocrinologist was "not an emergency and therefore was scheduled for several months out" and Plaintiff felt that "the people who have control over my care do not understand or care about my wellbeing."  Plaintiff was experiencing an increase of anxiety, frustration, and depression due to a "perceived lack of medical attention."  By that time, Plaintiff had requested an evaluation so that transition surgery could be performed.

46.    Following the meeting, Dr. Torres noted that the Plaintiff's mood "substantially improved" because the Warden at FCI Miami said that there would be a meeting the next day to expedite the appointment with the endocrinologist.

47.    On February 22, 2016, Dr. Alarcon along with the clinical director at FCI Miami, the chief psychologist, Dr. Chipi, the medical doctor, and the BOP transgender team held a teleconference meeting to discuss the Plaintiff's request for surgery.  The team denied Gender-Affirming Surgery, erroneously concluding that Plaintiff's hormone treatment plan had not remained at goal for a year and that Plaintiff had not

had "a full-time real-life experience in [Plaintiff's] preferred gender to demonstrate consolidation of gender identity."  Defendants John Doe I and John Doe II, in addition to other BOP officials, participated in this denial.

48.    Later that day, Plaintiff met with Dr. Skibinski at BOP psychology services to discuss the results of the multi-disciplinary meeting held with TCCT and TEC regarding Plaintiff's concerns about the progress of her medical treatment in light of the new Transgender Offender Program Statement which had recently gone into effect.  When questioned about hormone therapy, Plaintiff indicated that she stopped taking the hormones prescribed at FCI Miami due to side effects "(heart palpitations, numbness down her side, etc.) as well as the fear that they could cause cancer."

49.    On February 27, 2017, Plaintiff filed an Informal Resolution (No. 908238) requesting an administrative remedy and claiming a violation of the Eighth Amendment by Dr. Chipi and Dr. Alarcon for refusing to provide constitutionally adequate medical treatment for gender dysphoria and requested approval for breast augmentation surgery and surgical castration, and a consult with UM's LBGTQ Center in Miami. Plaintiff outlined that the surgical procedures were medically accepted as part of the triadic therapeutic protocol for the treatment of Gender Dysphoria.  A response was received on March 8, 2017 stating that Plaintiff's request for surgeries had been submitted to the BOP TCCT for initial review and approval by the BOP Medical Director for approval.

50.   The next day, March 9, 2017, Plaintiff filed an Administrative Remedy Appeal (No. 908238-F1), for not receiving medical treatment for Gender Dysphoria, and also requested a consultation with a transgender specialist.  Upon information and belief, in addition to other BOP officials, Defendants Connors, John Doe I and John Doe II participated in this denial.

51.   On March 13, 2017, Plaintiff met with Dr. Christopher Estes, an off-site OBGYN at Westchester General Hospital, to assess Plaintiff's medical needs for transgender issues.  Dr. Estes noted that Plaintiff was experiencing "poor progress in transition," and that her risk of breast cancer with estrogen therapy is "significantly increased."  Further, Dr. Estes documented, "The patient's gender transition remains poorly addressed." Dr. Estes prescribed Vaniza, Finasteride, a repeat of lab work, and ordered a follow-up visit.  These directives were followed by BOP health services at FCI Miami.

52.   On April 20, 2017, Plaintiff met with Dr. Estes for the follow-up appointment wherein Plaintiff reported "feeling badly about myself in regards to my gender transition."  Dr. Estes recommended that Plaintiff obtain letters from two mental health providers for orchiectomy to confirm her Gender Dysphoria.  Dr. Estes also provided a consultation referral for Plaintiff to meet with Dr. Chris Salgado, a surgeon.

53.   On May 8, 2017, a teleconference was held with the FCI Miami Clinical

Director, Chief Psychiatrist, BOP Medical Director, and BOP TCCT. Thereafter, Plaintiff's surgical requests were discussed and tabled. No decision was made approving or denying the requests. Defendants John Doe I and II, in addition to other BOP officials, participated in this teleconference.

54.   On July 13, 2017, Plaintiff was seen by Dr. Estes for a follow-up appointment. There was no change in Plaintiff's Gender Dysphoria on the current medications and the labs were essentially unchanged. Dr. Estes increased the Finasteride, ordered a refill of Vaniza, and prescribed breast forms. Moreover, Dr. Estes referred Plaintiff to Dr. Gregory Dowbak for an evaluation for orchiectomy and top surgery, which Dr. Estes deemed "necessary to address persistent gender dysphoria." These directives were entered by health services at FCI Miami on the same day but the evaluation never occurred.

55.   On or about July 20, 2017, Dr. Alarcon submitted a consultation request for Plaintiff to consult with Dr. Gregory Dowbak, plastic surgeon, for evaluation for orchiectomy and top surgery. The same day, Plaintiff was informed that the Warden authorized the purchase of breast forms and she was able to purchase the same size breast form she wore in the community prior to incarceration.

56.   On July 25, 2017, a teleconference was held in which Plaintiff's medically necessary surgery requests were discussed but denied for non-medical reasons and contrary to both the Endocrine Society Clinical Practice Guidelines and WPATH

standards of care.  Upon information and belief, in addition to other BOP officials, Defendants Connors, John Doe I and John Doe II participated in this denial.

57.     On July 27, 2017, Plaintiff received a response to her Request for Administrative Remedy (No. 908238-F1), through which she had appealed the denial of the surgery, stating that the requests were under consideration.

58.     On August 2, 2017, Plaintiff filed a Regional Administrative Remedy Appeal (No. 908238-R1) citing the prior two requested remedies of surgery and further noting her visits with Dr. Estes during which he requested she consult with a surgeon. Plaintiff received a response on August 31, 2017, stating that the surgery request was generated previously and was awaiting review and decision by the TCCT, another delay.  Upon information and belief, in addition to other BOP officials, Defendants Connors, John Doe I and John Doe II participated in this denial.

59.     On September 28, 2017, Plaintiff was seen by Dr. Estes for a follow-up appointment.  Dr. Estes noted that Plaintiff was "currently on the max dose of medications with some response, but not to an acceptable level" and that Plaintiff strongly desired an orchiectomy.  Dr. Estes recommended that Plaintiff "obtain a consult with Dr. Gregory Dowbak as previously requested ASAP."  The next day these directives were entered at FCI Miami and Drs. Alarcon and Chipi submitted a consultation request.

60.     On September 30, 2017, Plaintiff filed a Central Office Administrative

Remedy Appeal (No. 908238-A1) further alleging that the TCCT had been reviewing the requests since February 2017 without action and was causing Plaintiff to needlessly suffer. She reiterated that Dr. Estes recommended surgery be performed as soon as possible, but it never occurred.  She also reported and attempted to resolve the fact that she had been referred to Dr. Dowbak but no consult ever occurred.  Upon information and belief, in addition to other BOP officials, Defendants Connors, John Doe I and John Doe II participated in this denial.

61.    On October 2, 2017, a multi-disciplinary teleconference with the TCCT and TEC was held during which the Plaintiff's prescribed surgery requests were discussed and inexplicable denied for non-medical reasons, contrary to both the Endocrine Society Practice Guidelines and WPATH standards of care.  Upon information and belief, in addition to other BOP officials, Defendants Connors, John Doe I and John Doe II participated in this denial.

62.    On October 19, 2017, Dr. Chipi of BOP health services entered an administrative note indicating that the requested plastic surgery consultation with Dr. Dowbak be "refer[ed] up to Region by Alarcon."  The comments section further indicated that Plaintiff had been recommended for orchiectomy and was referred for BOP regional review.

63.    Plaintiff received a response to the Central Office Administrative Remedy Appeal (No. 908238-A1) which stated that the TCCT acknowledged receipt of the

surgery request and it was pending.  The BOP deferred its decision then to the TCCT.

64.    On November 15, 2017, the bi-annual assessment of transgender meeting took place. Notwithstanding the medical reports and requests for medically necessary surgery for Plaintiff's medically diagnosed condition, Gender Dysphoria, TCCT determined there were no medical issues with Plaintiff at that time.  Again inexplicably, no decision was made regarding Dr. Estes' request for Plaintiff's surgical consultation.

65.    On December 11, 2017, Plaintiff submitted an Administrative Tort Claim #TRT-SER-2018-01940 due to the denial of the consult with Dr. Dowbak and the medically necessary surgery.

66.    On December 20, 2017, during a multi-disciplinary meeting with the TCCT and TEC at the Warden conference room, Plaintiff's surgical intervention requests prescribed by Dr. Estes were not approved. Upon information and belief, in addition to other BOP officials, Defendants John Doe I and John Doe II participated in the decision not to approve the surgical intervention.

67.    On January 5, 2018, Plaintiff went to an appointment with off-site endocrinologist, Dr. Anguiera-Serrano, who examined Plaintiff.  Dr. Anguiera-Serrano noted that his testosterone was not being suppressed despite being at the maximum dose of medications, and agreed with the recommendation to proceed with surgical intervention was the "best treatment at this time."  Dr. Anguiera-Serrano prescribed

Lupron "as a temporary measure to help alleviate symptoms while waiting for surgery to be performed."

68.    On February 5, 2018, a multi-disciplinary teleconference with the TEC and TCCT was held and notwithstanding multiple physicians who determined Plaintiff's surgery to be medically necessary, prescribed surgical intervention was denied.  Upon information and belief, in addition to other BOP officials, Defendants John Doe I and John Doe II participated in this denial.

69.    Thereafter, on February 14, 2018, Plaintiff filed a second Informal Resolution (No. 933147), asking for written reasons why her request for prescribed surgeries were denied on February 5, 2018.  She received a short response that "this was denied at the regional level."  Upon information and belief, in addition to other BOP officials, Defendant Connors participated in this denial.

70.    On February 22, 2018, Plaintiff filed a Regional Administrative Remedy (No. 933147-F1) indicating that the response given previously completely disregarded the details of her complaint and again requested that the Regional Office state in writing the exact reasons why her prescribed surgeries were denied.  Furthermore, she filed a Request to Transfer to Tallahassee FCI, a female institution, stating that she would feel safer housed at a female facility and would receive the proper medical treatment there.  She also alleged that the BOP Medical Director and Southeast Region Medical Director advised Dr. Alarcon to submit a

medical transfer to a female facility, which Dr. Alarcon failed to do.  Further, Plaintiff received another response on March 28, 2018 denying her the medically necessary surgery stating that she did not meet the BOP criteria for the requested surgery.  Upon information and belief, in addition to other BOP officials, Defendants Connors, John Doe I and John Doe II participated in this denial.

71.     Plaintiff then submitted a Regional Administrative Remedy (No. 933147-R1) on April 3, 2018, detailing that the BOP required that she be housed in a female facility for over one year before surgeries were allowed to be performed.  Around that same time, Dr. Alarcon informed Plaintiff that her surgery requests had been pending with TCCT since February 2017 and that "higher-ups" within the BOP were preventing her from her prescribed treatment and determined that she would not receive the prescribed surgeries.  Additionally, Dr. Alarcon relayed that he had been admonished for sending Plaintiff to Dr. Estes, the transgender specialist, and that the BOP would not transfer her to a female facility and would use Plaintiff's failure to reside in a female facility as a reason to deny her requests for surgery.

72.     On five occasions between April 18 and May 3, 2018, Plaintiff was seen by FCI Miami health department for complications with Lupron therapy.  It was not working and she needed surgery.

73.     Predictably, and as Dr. Alarcon had said, Plaintiff received a response

to her Regional Administrative Remedy (No. 933147-R1) on May 22, 2018,

denying her request for surgery because she failed to meet the BOP clinical criteria

which required her to be housed in a female institution for one year to be considered

for the surgery.  BOP managers and officials together with TCCT refused to permit

Plaintiff to transfer to a female facility which requirement was an unreasonable

impediment to her surgery, in and of itself.   Upon information and belief, in

addition to other BOP officials, Defendants Connors, John Doe I and John Doe II

participated in this denial.

74.    On June 1, 2018, Plaintiff submitted a request to the FCI Miami

psychology department for a letter of referral for surgery.  On June 11, 2018,

Plaintiff was advised by Dr. Burgos, the acting chief psychologist, that Plaintiff's

request was received by the TEC.  Despite being in possession of the June 1, 2018

letter, the TEC unreasonably requested another letter from Plaintiff.

75.    On July 4, 2018, Plaintiff submitted a Central Office Administrative

Remedy Appeal (No. 933147-A1).  She claimed that the BOP clinical guidelines

were contrary to the WPATH standards of care and that the Transgender Offender

Manual was improperly and illegally amended to include that "the designation to a

facility of the inmate's identified gender would be appropriate only in rare cases

after consideration of all the [factors listed], and where there had been significant

progress towards transition." The prior response was issued just after the

amendment was made and done so knowing the BOP would not transfer her to a female facility.  Additionally, at that time, Plaintiff's transitional prescribed medical treatment was being ignored and denied.  Moreover, Plaintiff was informed by Associate Warden Stevie Knight well before the response was issued that her transfer request was denied.  There was consequently, no meaningful review or consideration of Plaintiff's request to transfer or for surgery.

76.    On July 6, 2018, Plaintiff was seen by Dr. Angueira-Serrano, who noted, "Given the patient has contraindications to estrogen therapy (due to breast nodules) and she is having side effects from the Lupron she does require the orchiectomy." The FCI Miami health department submitted a consultation for plastic surgery on the same day.

77.    On August 1, 2018, Plaintiff received a response to her Central Office Administrative Remedy Appeal (No. 933147-A1) through which she appealed the utter refusal to address her Gender Dysphoria through surgery, repeated denials of care related thereto, the refusal of the BOP to transfer her to a female facility and other inactions of the BOP generally relating to its refusal to address her urgent need for surgery.  The response stated that her appeal lacks merit.  Upon information and belief, in addition to other BOP officials, Defendant Connors participated in this denial.

78.    On November 2, 2018, Plaintiff was seen again by Dr. Angueira-

Serrano, who documented, "the patient requires orchiectomy and breast augmentation for the gender change. The patient has had adverse effects from medical therapy, so surgical therapy is the only resource to treat her properly at this time." Plaintiff was given written prescriptions for breast augmentation and bilateral orchiectomy for Gender Dysphoria. On the same day, Drs. Chipi and Alarcon submitted a consultation request for general surgery.

79.   On December 13, 2018, a multidisciplinary teleconference including the BOP was held where the Plaintiff's prescribed surgeries were discussed. Again, notwithstanding Plaintiff's physicians' prescribed course of treatment including surgery for Gender Dysphoria, Plaintiff's medically necessary surgery requests were denied as an elective procedure. Upon information and belief, in addition to other BOP officials, Defendants Connors, John Doe I and John Doe II participated in this denial. Dr. Alarcon submitted another consultation request for general surgery.

80.   On December 21, 2018, Dr. Alarcon's administrative note indicates that Plaintiff's case was discussed by the TEC and recommended maximizing hormone therapy, providing gender-affirming recommendations, and begin release planning. There was no further discussion of surgery.

81.   On February 14, 2019, Plaintiff was released from the BOP. During her incarceration, she received no meaningful treatment for her diagnosed serious

medical condition of Gender Dysphoria.

82.     Although numerous BOP medical and mental-health officials recognized Plaintiff's diagnosis, they failed to provided her with medically prescribed treatment for her Gender Dysphoria. Her diagnosis had been recognized by BOP psychiatrists, psychologists, mental-health specialists, and other medical personnel and officials, including Dr. Christopher Estes, OBGYN and Dr. Engenio Anguerio-Serrano, endocrinologist.

83.     Plaintiff repeatedly requested treatment for her Gender Dysphoria to mental health and medical officials and that she be provided comprehensive, medically necessary treatment for Gender Dysphoria, including orchiectomy and breast augmentation. These requests were denied. The denial of Plaintiff's requests based on reasons divorced from medical judgment constitutes deliberate indifference.

84.     Plaintiff has retained the undersigned to represent her interests in this case and is obligated to pay her for her services.  Defendant should be made to pay for said services under the laws applicable to this action.  Attorneys' fees and costs are also sought under 28 U.S.C. §2412 and 42 U.S.C. §1988.

**D.     Exhaustion**

85.     Plaintiff has fully exhausted her administrative remedies in accordance with the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C § 1997e(a) and *United*

*States v. Lucas*, 898 F.2d 1554 (11th Cir. 1990) (inmate must exhaust administrative remedies provided by the BOP for resolution of inmate complaints as a prerequisite to filing suit). She has done so at least twice.

86.    Plaintiff's appeal that concerned her need for surgical intervention for her gender dysphoria and that was pending with TCCT on November 6, 2017, constitutes exhaustion.

87.    The August 1, 2018, denial of an appeal from National Inmate Appeals concerning Plaintiff's need for treatment for her gender dysphoria constitutes exhaustion.

## COUNT I
## Denial of Medically Necessary Care in Violation of the Rehabilitation Act

88.    Plaintiff re-alleges and incorporates by reference paragraphs 1-87 above.

89.    This is an action against Defendant Barr for violation of the Rehabilitation Act.

90.    Section 794(a) of the Act provides in relevant part that "[n]o otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive Agency."

91.    At all times pertinent hereto, Plaintiff has been qualified as an individual with a disability as defined by section 705(20) of the Act.

92.    At all times pertinent hereto, Defendant has been subject to the Act. Defendant is liable for its failures as related to its denial of medical care and accommodations to Plaintiff due to her disability, as its refusals as outlined above constitute a violation of the Act.

93.    Plaintiff is a transgender woman with Gender Dysphoria, a serious medical and disabling condition.

94.    BOP officials were aware that Plaintiff had Gender Dysphoria and was receiving hormone therapy and expressing her female gender in all aspects of her life under the care of a physician both prior to and during her incarceration.

95.    It is medically necessary for Plaintiff to live as female, to receive hormone therapy, and to receive all other treatment for Gender Dysphoria deemed medically necessary by a qualified provider including surgery and living as a female.

96.    BOP officials refused to reasonably accommodate Plaintiff and refused to provide her with medically necessary care including surgery. This refusal was in the face of qualified medical professional opinions that Plaintiff needed surgery, which were ignored.

97.    BOP officials were aware that Plaintiff was seeking surgical

intervention to treat her Gender Dysphoria based on competent medical opinions, that surgery was available to treat her disabling condition and that the denial of this needed medical care caused serious harm to Plaintiff.

98.   As a result of being denied access to surgery and other accommodations for her condition by Barr, on behalf of the BOP/DOJ, Plaintiff has suffered damages including without limitation an exacerbation of her physical and mental impairments, pain and suffering, loss of the enjoyment of life and other tangible and intangible damages.  These damages have occurred in the past, are occurring at present, and will occur in the future.  She has also suffered from the delay in treatment and for costs associated with treatment now that she is no longer incarcerated.  These damages have occurred in the past, at present and are likely to occur in the future.

## COUNT II
## Denial of Medically Necessary Care in Violation of the Eighth Amendment

99.   Plaintiff re-alleges and incorporates by reference paragraphs 1-87 above.

100.   This is an action against Defendants Connors, John Doe #1 and John Doe #2 for violations of the Eighth Amendment.

101.   While Plaintiff was incarcerated at FCI Miami, she presented evidence of an objectively serious medical need.  The individual Defendants acted with deliberate indifference to that serious medical need by intentionally denying

Plaintiff's medically necessary treatment for Gender Dysphoria.  After notice of the need for surgery and other treatments attendant to her need for surgery, Plaintiff was subjected to the deprivation of medically necessary case that was so serious that the individual Defendants denied her "the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).  "The basic concept underlying the Eighth Amendment is nothing less than the dignity of the man." Keohane v. Jones, Case No. 4:16-cv-511-MW-CAS (N.D. Fla., August 22, 2018, Doc 171)(quoting Trop v. Dulles, 356 U.S. 86, 100 ((1958)).

102.   Plaintiff has a serious medical need, namely, Gender Dysphoria, as diagnosed by physicians who prescribed treatment including surgery.

103.   The Defendants were aware of the accepted standards of care for Gender Dysphoria and recklessly disregarded the substantial risk of serious harm by repeatedly denying Plaintiff's prescribed medical treatments, specifically, orchiectomy and breast augmentation.

104.  Defendants repeatedly ignored accepted standards of care and Plaintiff's physician's diagnoses by delaying and denying the prescribed treatment, knowing that the current regime was inadequate, thereby exhibiting deliberate indifference to her medical needs, and prolonging her mental suffering without any legitimate purpose.

105.  As a result of being denied access to surgery and other

accommodations for her condition, Plaintiff has suffered damages including without limitation an exacerbation of her physical and mental impairments, pain and suffering, loss of the enjoyment of life and other tangible and intangible damages. These damages have occurred in the past, are occurring at present, and will occur in the future. She has also suffered from the delay in treatment and for costs associated with treatment now that she is no longer incarcerated. These damages have occurred in the past, at present and are likely to occur in the future. Plaintiff is entitled to punitive damages against the individual defendants.

## **PRAYER FOR RELIEF**

Plaintiff respectfully requests that this Court:

(a)     Declare that the BOP denied Plaintiff medically necessary treatment and accommodations for Gender Dysphoria in violation of the RA;

(b)     Declare that the Defendants acted with deliberate indifference to Plaintiff's objectively serious medical needs;

(c)     Grant equitable relief against the Defendant under the applicable counts set forth above, mandating the Defendant's obedience to the laws enumerated herein and providing other equitable relief to the Plaintiff including payment for her surgery;

(d)     Enter judgment against Defendant and for Plaintiff awarding all legally-available general and compensatory damages including economic

and noneconomic losses to Plaintiff from Defendant for Defendant's violations of law enumerated herein;

(e)      Enter judgment against Defendant and for Plaintiff permanently enjoining Defendant from future violations of law enumerated herein;

(f)      Award Plaintiff her reasonable attorneys' fees, litigation expenses, and costs incurred in connection with this action from Defendants, pursuant to the RA, 42 U.S.C. § 1988 and 28 U.S.C. §2412;

(g)      Award Plaintiff interest where appropriate; and

(h)      Award all other relief that this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury on all issues herein that are so triable.

Respectfully submitted,


/s/ Marie A. Mattox
Marie A. Mattox [FBN 0739685]
MARIE A. MATTOX, P. A.
203 North Gadsden Street
Tallahassee, FL 32301
Telephone: (850) 383-4800
Facsimile: (850) 383-4801
ATTORNEYS FOR PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has

been furnished to all counsel of record by CM/ECF this 26th day of July, 2016.


<u>/s/ Marie A. Mattox</u>
Marie A. Mattox