## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA TALLAHASSEE DIVISION

**CHRISTOPHER SHORTER,**

　　**Plaintiff,**

**vs.**　　　　　　　　　　　**CASE NO.: 4:19-CV-108-WS-MAF**

**WILLIAM B. BARR, et al.,**

　　**Defendant.**

**_____/**

## REPORT AND RECOMMENDATION

Plaintiff, (a/k/a Chrissy Shorter[1]), a former inmate incarcerated in the Federal Bureau of Prisons (BOP) represented by counsel,[2] filed a second amended complaint, pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), and was granted leave to proceed *in forma pauperis*. ECF Nos. 40, 10. This Cause is currently before the Court upon the motion for summary judgment with supporting exhibits

---

[1] During incarceration, Plaintiff was diagnosed with gender identity disorder (GID). ECF No. 1, p. 14. Although born male and classified by the BOP as a male inmate, Plaintiff identifies as a female and uses the "she" pronoun in her pleadings. This Report reflects the same. See Federal Bureau of Prisons Inmate Locator listed as Christopher Lamont Shorter, Register Number 21344-017, https://www.bop.gov/inmateloc/. Accessed 7/27/2021.

[2] Plaintiff initiated this civil rights action *pro se* on June 19, 2018, in the United States District Court for the Southern District of Florida as Case No. 1:18-CV-22472-MGC. ECF No. 1. Plaintiff is now represented by counsel. ECF No. 39. At the time of initiation, Plaintiff was a federal inmate and was later released on February 14, 2019.

filed by Defendants Connors and Barr. ECF Nos. 82, 83. Plaintiff filed a response in opposition; and Defendants filed a Reply. ECF Nos. 90, 91. Plaintiff also filed her own motion for summary judgment with supporting exhibits. ECF Nos. 86, 87, 88, 89.

After careful review, for the reasons stated below, Defendants' Motion for Summary Judgment should be granted; and Plaintiff's Motion for Summary Judgment should be denied. Finally, the case should be closed. Before addressing Plaintiff's claims, a brief discussion of the litigation history is warranted.

## I.    Plaintiff's Related Litigation History

Plaintiff filed two prior lawsuits, in 2017, requesting injunctive relief to reverse the BOP's denial of her requests for an orchiectomy[3] and breast augmentation surgery she claimed was medically necessary to treat gender dysphoria (GD).[4] See S.D. Fla. Case Nos. 17-CV-24736-COOKE and 1:17-CV-24476-UU. The cases were ultimately dismissed without prejudice. Id.

---

[3] Orchiectomy is the removal of one or both testicles. See Johns Hopkins Medicine, Radical Orchiectomy. https://www.hopkinsmedicine.org/health/conditions-and-diseases/testicular-cancer/radical-orchiectomy. Accessed: August 16, 2021.

[4] Courts have also used the term "transsexualism," and "gender dysphoria," interchangeably with gender identity disorder (GID), to describe the same condition. To maintain consistency, this Report refers to the condition as gender dysphoria (GD) as codified in the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition (DSM-5) and the International Classification of Diseases-10 (ICD-10). Importantly, at no time during her incarceration did Plaintiff request full gender reassignment surgery.

Over the course of the three cases, Plaintiff attempted to sue numerous persons and entities including prison wardens, various prison officials, the director of the BOP, BOP physicians and medical directors, the attorney general of the United States, and the United States. Id.

Plaintiff initiated the instant case over three years ago and, originally, named thirteen defendants.[5] ECF No. 1. The remaining defendants are Ian Connors, the national appeals administrator of BOP, in his individual capacity; William P. Barr, the former attorney general in his official capacity; and two "John Does" who were never served or identified. ECF Nos. 40, p. 5; 82, p. 3. In April 2020, this case survived Defendants' motion to dismiss. ECF Nos. 58, 60. Preferring to "err on the side of caution," the Court allowed Plaintiff's claim of disability discrimination under the Rehabilitation Act to proceed against Defendant Barr. ECF No. 58, p. 24. At the time, the Court reasoned "no circuit court of appeals has answered the question" of whether GD was excluded from the definition of disability under the Act. Id. Additionally, the Court found personal jurisdiction over Connors because, in the operative complaint, Plaintiff alleged that Connors personally participated in multidisciplinary teleconferences denying surgery for non-medical

---

[5] During her incarceration, Plaintiff filed this case in the Southern District of Florida as Case No. 1:18-cv-22474. Once released, Plaintiff filed a motion to transfer venue to this Court, which was granted on March 1, 2019. ECF Nos. 23, 24, 25.

reasons; if true, Connors was not entitled to qualified immunity. Id., pp. 28-31, 34. In the past three years, the law relating to Plaintiff's case has evolved. It has become evident that summary judgment in favor of the Defendants is proper.

## II.    Allegations of Plaintiff's Amended Complaint, ECF No. 40.

### A. Plaintiff's Medical History During Incarceration

At the core of this case is whether Defendants are liable for failing to provide Plaintiff with proper medical treatment and reasonable accommodations to address her GD. Plaintiff served a 96-month federal prison sentence from July 2012 through February 2019 at multiple federal prisons.[6] Plaintiff's BOP medical records encompass more than 1,700 pages.[7] See ECF No. 83-1. This Report summarizes Plaintiff's relevant medical history primarily as set forth in the adopted Report and Recommendation issued by the prior magistrate judge.[8] See Report, ECF No. 58, pp. 2-13.

---

[6] Plaintiff was convicted of conspiracy to defraud the government, wire fraud, mail fraud, and aggravated identity theft. N.D. Fla. Case No. 4:12-cr-00011-MW-GRJ, ECF No. 62. Medical records indicate that Plaintiff was an inmate at Oakdale FCI, FCI Fort Dix, Tallahassee FCI, Coleman FCI, and Miami FCI. ECF No. 83-1.

[7] See also exhibits at ECF Nos. 1-1, pp. 109-258, 266-423; 87, 88, 89.

[8] The Honorable Charles A. Stampelos was previously assigned to this case. The Court reassigned the matter to the Undersigned on April 3, 2020. ECF No. 59.

It is undisputed that, from at least 2014 until her release, Plaintiff received regular medical treatment and numerous accommodations for GD including hormone therapy; testosterone blockers; psychology services; breast forms; female clothing and cosmetics; single cell- and shower accommodations; offers to transfer to a female prison; and multiple consultations with several offsite medical providers.[9]

Plaintiff "alleged that she has been living full-time as a woman since 2008" and was first diagnosed with GD[10] in October 2014 during her incarceration.[11] ECF No. 58, p. 3. Plaintiff began hormone therapy to suppress testosterone production; and by December 2014, her medical regimen included testosterone blockers, estrogen patches, and estrogen

---

[9] Plaintiff was referred to Dr. Anguiera-Serrano an endocrinologist; Dr. Estes, an OB/GYN; and surgeons Dr. Chris Salsado and Dr. Gregory Dowbak. See ECF No. 83-1, pp. 834, 854.

[10] According to the American Psychiatric Association, GD is:

> a concept designated in the DSM-5 as clinically significant distress or impairment related to a strong desire to be of another gender, which may include desire to change primary and/or secondary sex characteristics. Not all transgender or gender diverse people experience dysphoria.

The DSM–5 explicitly states that the "gender non-conformity is not in itself a mental disorder." See Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 451 (5th Ed. 2013).

[11] Dr. Barbara Moorehead, the attending chief psychologist at FCI Oakdale, diagnosed Plaintiff with gender identity disorder. ECF No. 40, p. 9.

therapy. Id., pp. 3-4. In December 2015, Plaintiff had "no problems with hormones" and was only "in the process" of contemplating surgery. ECF No. 83-1, p. 126, 131. In 2016, Plaintiff developed a lump in her right breast.[12] ECF No. 58, p. 4. Plaintiff met with Dr. Alarcon, a BOP physician, and expressed concern that that she might develop breast cancer, sought to discontinue hormone therapy, and then requested surgery.[13] Id., p. 4. Dr. Alarcon prescribed medroxyprogesterone to facilitate breast growth. Id. Following various tests, Plaintiff underwent a lumpectomy. Id. There was "no malignancy," but Plaintiff was "positive for lobular hyperplasia." Id. Plaintiff alleges she discontinued the hormone therapy in December 2016 "due to complications." Id., pp. 4-5.

From 2016 through 2017, Plaintiff received psychology services expressing suicidal ideation, emotional distress, and preoccupation with genital mutilation. Id., p. 5. Plaintiff filed complaints against medical staff claiming her GD care was inadequate. Id. Again, Plaintiff requested surgery.

---

[12] Medical records indicate that Plaintiff was transferred to Miami FCI around December 2015. ECF No. 83-1, p. 121-22. Plaintiff was evaluated by Dr. Alarcon in January 2016 and was noted as doing well with her hormonal treatment plan. Id.

[13] At all times relevant, Plaintiff only requested an orchiectomy and top surgery. Plaintiff testified at deposition that, after her release from prison, she had full gender-affirming surgery (breast augmentation in July or August 2019 and "vaginoplasties" in February 2020) and restarted hormone therapy in May 2020. ECF No. 83-16, pp. 47, 129-33.

Id. Distressed because an off-site endocrinologist appointment was months away, Plaintiff expressed a desire to commit suicide by castration. Id.

Plaintiff continued to request surgery. Id., p. 6. The BOP transgender team, Dr. Alarcon, Dr. Chipi, and the clinical director of Miami FCI met to discuss the surgical request; but, in Plaintiff's opinion, they erroneously denied it. Id. Plaintiff reported to psychology services that she stopped taking hormones due to side effects and the risk of cancer. Id., p. 6. During 2017, Plaintiff filed administrative grievances against certain prison and medical personnel alleging Eighth Amendment violations and requested surgery, a consult with the University of Miami's LBGTQ Center, and consultation with a transgender specialist. Id., p. 6. In her complaint, Plaintiff alleged that Connors personally participated in the denial of surgery. Id., p. 7.

In March 2017, BOP arranged for Plaintiff meet with Dr. Estes, an offsite OB-GYN. Id., pp. 7-8. Dr. Estes opined that Plaintiff's gender transition "remain[ed] poorly addressed." Id., p. 7. Dr. Estes prescribed Vaniza, Finasteride, and breast forms, all of which were approved by BOP. Id., p. 8. Plaintiff claimed that Dr. Estes deemed the surgeries necessary, made a referral to a plastic surgeon, and recommended Plaintiff obtain letters from two mental health providers. Id., pp. 7-8. Dr. Alarcon submitted the surgical consultation request; but, ultimately, the request was denied. Id., p. 8.

In January 2018, Dr. Anguiera-Serrano evaluated Plaintiff and recommended surgery was the best treatment given the adverse effects from medical therapy and prescribed Lupron. Id. p. 10; see also ECF No. 83-1, pp. 786, 1410-13. Plaintiff alleged complications from the Lupron therapy. Id., p. 10. Eventually, Plaintiff was given a prescription for the surgery; and Doctors Chipi and Alarcon requested general surgery. Id., pp. 12-13. Plaintiff claimed that surgery was denied several times for non-medical[14] reasons and, at the time she initiated her complaint, believed Connors participated in the denial of surgery contrary to the opinions of the off-site physicians. Id., pp. 11-13.

B. Plaintiff's Claims against Defendants Barr and Connors

Plaintiff sues Barr for violation of the Rehabilitation Act, § 794(a) claiming she is qualified as an individual with a disability as defined by § 705(20) of the Act. ECF No. 40, pp. 26-27. Plaintiff asserts that GD is "a serious medical and disabling condition." Id., p. 27. Plaintiff alleges that officials refused to make reasonable accommodations and refused to approve gender-affirming surgery contrary to her physicians who opined

---

[14] Assignment to a women's prison for one year was required before surgery would be approved. Plaintiff's medical records indicate that the BOP guidelines for surgery also included hormonal therapy for one year and enough time remaining on a prison sentence to complete surgical and post-surgical care. ECF No. 83-1, pp. 879-81.

surgery was the best option. Id. According to Plaintiff, the denial of surgery and other accommodations by Barr (on behalf of the BOP and DOJ) caused pain and suffering, loss of enjoyment of life, and other damages. Id., p. 28. However, Plaintiff does not allege that Defendants denied her any specific accommodations other than the orchiectomy and breast augmentation. See ECF No. 40, generally.

Plaintiff sues Defendant Connors for deliberate indifference to a serious medical need in violation of the Eighth Amendment. Id., pp. 28-29. Plaintiff claims that Defendant Connors acted with reckless disregard by repeatedly denying Plaintiff surgery he knew was medically necessary. Id., p. 3. Plaintiff maintains that "[i]t is medically necessary for [her] to live as female, to receive hormone therapy, and to receive *all* other treatment for Gender Dysphoria deemed medically necessary by a qualified provider including surgery . . ." Id., p. 27. According to Plaintiff, the denial caused an exacerbation of her physical and mental impairments, pain and suffering, loss of enjoyment of life, and other damages.

Plaintiff seeks declaratory relief; reimbursement for her completed, gender-affirming surgery; court costs; and a permanent injunction against Defendants "from future violations of the law." Id., p. 31.

## III.    Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is proper:

> [i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

Accordingly, summary judgment should be entered only against

> a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (citations omitted).

Thus, pursuant to Celotex and its progeny, a movant for summary judgment bears the initial responsibility of informing the court of the basis for her motion by identifying those parts of the record that demonstrate the nonexistence of a genuine issue of material fact. This demonstration need not be accompanied by affidavits. Hoffman v. Allied Corp., 912 F.2d 1379, 1382 (11th Cir. 1990). If the party seeking summary judgment meets the

initial burden of demonstrating the absence of a genuine issue of material fact, the burden shifts to the non-moving party to present sufficient evidence to rebut this showing with affidavits or other relevant and admissible evidence. Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991).

It is the non-moving party's burden to come forward with evidence on each essential element of her claim sufficient to sustain a jury verdict. Earley v. Champion Int'l Corp., 907 F.2d 1077, 1080 (11th Cir. 1990). The non-moving party cannot rely solely on her complaint and other initial pleadings to contest a motion for summary judgment supported by evidentiary material, but must respond with affidavits, depositions, or otherwise show there are material issues of fact which demand a trial. Fed. R. Civ. P. 56(e); Coleman v. Smith, 828 F.2d 714, 717 (11th Cir. 1987). The trial judge, at the summary judgment stage, does not weigh the evidence but rather determines whether there is a genuine issue for trial: "if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); Baldwin Cty., Ala. v. Purcell Corp., 971 F.2d 1557, 1563 (11th Cir. 1992). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."

Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing Anderson, supra).

The Supreme Court has stressed:

> [w]hen the moving party has carried its burden under rule 56(c) its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'

Matasushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (footnote omitted). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48. Finally, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007).

## IV.     Parties' Motions for Summary Judgment and Responses

### A.  Defendants' Motion for Summary Judgment, ECF No. 82

Defendants detail the medical treatment and accommodations provided to Plaintiff for her GD. ECF No. 82, pp. 3-12. Over the course of incarceration, BOP provided Plaintiff with mental health services (counseling

and prescriptions for Celexa and Zoloft); hormone therapy (Spironolactone, Medroxyprogesterone, Finasteride, and Lupron); and arranged for her to be treated by outside specialists. Id., pp. 4, 26-27. In addition, BOP made numerous accommodations by providing Plaintiff with "breast forms, hair care products, women's panties, single cell housing assignments, offers to transfer to a female prison, exceptions to search procedures, private shower accommodations" and allowed her "to use make-up." Id., pp. 26-27. The only treatment Plaintiff requested and did not receive was specific surgery. Id., p. 31.

Connors continues to maintain that the Court lacks personal jurisdiction because he did not reside in Florida (the forum state) and does not have the necessary minimum contacts required to permit the court to exercise personal jurisdiction over him. Connors relies on Townsend v. Jefferson Cty., 601 F.3d 1152, 1159 (11th Cir. 2010) and claims that, as an administrator, he had no "involvement with Plaintiff's medical treatment, medical care, or medical requests" and could not have reasonably deduced that the medical direction was tangibly wrong and would result in substantive harm. Id., p. 9. Connors' involvement was limited to responding to two of Plaintiff's administrative grievances (908238-A1 and 933147-A1) at the national level, a mere ministerial function. Id., pp. 9, 15-17.

The two grievances evidence that Connors did not deny any surgery. Id., p. 10. Connors was not involved in Plaintiff's care; therefore, personal jurisdiction is improper as supported by Peppers v. Coates, 887 F.2d 1493, 1498 (11th Cir. 1989). Id., pp. 16-17. Even if jurisdiction were proper, Plaintiff did not suffer physical or mental injury (as evident from the medical record), and received proper treatment and accommodations from the BOP, thus, the Eighth Amendment claim fails. Id., pp. 9-12.

Barr maintains the Rehabilitation Act claim is without merit because Plaintiff "was not denied any medical care for any reason and especially not for being transgender." ECF No. 82, p. 28. Plaintiff is not entitled to the accommodation of her choice but only a reasonable accommodation under the Act. Id., p. 29. Defendant cites Lane v. Pena, 518 U.S. 187 (1996) to support the position that, as a matter of law, Plaintiff is not entitled to money damages because Congress did not waive sovereign immunity against monetary damages for violations under the Rehabilitation Act. Id., pp. 33-34. Although Plaintiff might have been entitled to equitable remedies (injunctive or declaratory relief), such relief would be improper here because Plaintiff is no longer in BOP custody. Id., p. 35. Therefore, the claim against Defendant Barr fails. Id.

B. <u>Plaintiff's Response, ECF No. 90</u>

Plaintiff states that Dr. Angueire-Serrano, an outside endocrinologist, treated her in May 2016, changed her hormonal medications, and requested to see her in three months but she did not return until January 2018. ECF No. 90, p. 4. Plaintiff largely repeats the summary of her treatment during incarceration. <u>Id</u>., pp. 4-17. Plaintiff maintains that both Dr. Estes and Dr. Angueire-Serrano recommended surgery was the best option for Plaintiff. <u>Id</u>., pp. 4-5. Plaintiff seems to suggest that the delays within the grievances process caused her to "needlessly suffer." <u>Id</u>., p. 13.

Plaintiff argues that there was an "utter refusal to address her gender dysphoria through surgery" or transfer to a female facility. <u>Id</u>., p. 17. Plaintiff admits that Connors did not outright deny Appeal No. 908238-A1. <u>Id</u>., p. 13. As to Appeal No. 933147-A1, Plaintiff points to the testimony of Todd Crawford, the Regional Health Services Administrator, that FCI Miami could have made the decision to allow Plaintiff's surgical interventions without additional approval. <u>Id</u>., p. 20. However, Crawford had no knowledge why the recommendations for surgery were ignored and stated that BOP is not required to follow the recommendations. <u>Id</u>., pp. 20-21. Crawford confirmed that BOP does not follow World Professional Association for Transgender Health (WPATH) standard of care. <u>Id</u>., p. 22.

C. <u>Plaintiff's Motion for Summary Judgment, ECF No. 86</u>

Plaintiff maintains that she is entitled to judgment in her favor as a matter of law. ECF No. 86, p. 1. Plaintiff largely reiterates her medical history and maintains that Defendants caused her substantial harm during her incarceration by denying her surgery and reasonable accommodations. <u>Id</u>., p. 2-24. Plaintiff acknowledges that BOP sent her to see two outside specialists; however, she suggests that because she was unable to continue hormone therapy surgical intervention was necessary. <u>Id</u>., pp. 2-3. Plaintiff claims two physicians recommended surgery, but the BOP would not approve the procedures. <u>Id</u>., p. 3. Plaintiff argues "[t]he surgeries were absolutely necessary to effectively treat Plaintiff's gender dysphoria"; thus, "[d]efendants are liable." <u>Id</u>.

Interestingly, in her motion for summary judgment, Plaintiff does not directly attribute the denial of surgery to either Defendant. Plaintiff admits that Defendant Connors "had absolutely no idea what kind of medical professionals served on any committee that may have reviewed Plaintiff's requests and could not explain the difference between TEC (Transgender Executive Committee or Council) and TCCT." <u>Id</u>., p. 11. Plaintiff admits she filed the appropriate grievances, which were appealed to the regional level, and, finally, the national level -- Connors' jurisdiction. <u>Id</u>. "There is no higher

authority than Connors." Id. Plaintiff claims Connors denied her appeals on the merits relying on Connors' response to Administrative Remedy No. 908238-A1 (Exhs. 3, 70). Id., p. 12 (see ECF No. 87-3, p. 2; 89-3, p. 10).

Plaintiff repeats that the surgery was a medical necessity; and Defendants were deliberately indifferent to a serious medical need. Id., pp. 16, 25-32. Defendant Barr discriminated against her, in violation of the Rehabilitation Act; and denial of the request for surgery is the equivalent of a denial of a reasonable accommodation. Id., pp. 32-34.

It is important to note that the primary reason this case survived a motion to dismiss is because Plaintiff alleged in her complaint that Connors participated in the denial of her requests for surgery *and not* just that Connors denied grievances or appeals. See the Court's adopted Report, ECF No. 58. Plaintiff had alleged that Connors personally participated in the multidisciplinary teleconferences on July 25, 2017; October 2, 2017; and December 13, 2018, which resulted in the denial of surgery. Id., p. 18. Now, Plaintiff makes no such allegation in her motion seeking summary judgment. Rather, Plaintiff attributes liability to Connors by relying solely on his responses to Plaintiff's grievance appeals to the national level. Finally, Plaintiff makes no mention of her claims against the two "John Does" in her motion for summary judgment. ECF No. 86, pp. 25-34.

D. Defendant's Reply Memorandum, ECF No. 91.

Defendants maintain there are no disputed material facts; and they are entitled to judgment as a matter of law. ECF No. 91, p. 1. Again, Defendant Connors maintains that the Court does not have personal jurisdiction. It is now clear that Connors never attended or participated in any teleconferences or multi-disciplinary meetings involving Plaintiff. Id., pp. 2-3. Moreover, Connors never participated in any of the medical decisions or treatments. Id., p. 3. Connors' only involvement was to sign the national-level response to Plaintiff's grievances. As such, Connors did not create the necessary minimum contacts with the forum state to permit the Court to exercise jurisdiction; and Plaintiff has provided no material facts to the contrary. Id., pp. 3-4.

## V.    Discussion

### A. The Claims Against the John Doe Defendants Should be Dismissed without prejudice.

As a preliminary matter, Plaintiff never identified the John Doe defendants and did not serve them with her complaint. Plaintiff initiated the case three years ago as a *pro se* litigant and later, on July 26, 2019, filed the operative amended complaint with the assistance of counsel. ECF Nos. 1, 40. Plaintiff had significant opportunity to pursue her claims against the John Does during the extensive litigation in this case which included a motion to

dismiss, multiple extensions of time for various filings and discovery (a discovery period exceeding one year), and failure to respond to defense counsel's assertion that he does not represent the John Doe defendants. See ECF Nos. 36; 38; 50; 54; 56; and 82, p. 3.

"Rule 41(b) of the Federal Rules of Civil Procedure authorizes a district court to dismiss a complaint *sua sponte* for failure to prosecute or failure to comply with a court order or the federal rules." Jones v. Commonwealth Land Title Ins. Co., 459 F. App'x 808, 811 (11th Cir. 2012) citing Lopez v. Aransas Cnty. Indep. Sch. Dist., 570 F.2d 541 (5th Cir. 1978). Essentially, Plaintiff has abandoned her claims against the John Doe defendants. Accordingly, dismissal of these claims for failure to prosecute is appropriate.

B. The Court Does Not Have Personal Jurisdiction over Defendant Connors.

This Court addressed the matter of personal jurisdiction at the motion to dismiss stage. ECF No. 58. Plaintiff's claim only survived because she sufficiently alleged in her complaint that Connors participated in multi-disciplinary teleconferences that resulted in denial of the recommended surgery. Id., p. 30. The Court was required to accept the material facts alleged in the complaint as true. Fed. R. Civ. P. 12(b)(6); Aschcroft v. Iqbal, 129 S. Ct. 1937, 1949-50 (2009). In short, the Court determined *plausibility* not *probability*.

In a <u>Bivens</u> action, liability may be imposed upon a defendant only if he or she is personally responsible for the constitutional violation alleged in the Complaint. <u>Peppers v. Coates</u>, 887 F.2d 1493, 1498 (1989). Plaintiff must produce sufficient evidence to at least raise the issue of whether a reasonable person in Connors' position would have known that his actions violated Plaintiff's clearly established constitutional or statutory rights. <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982); <u>Hadley v. Gutierrez</u>, 526 F.3d 1324, 1329 (11th Cir. 2008). Connors, a government official, is entitled to immunity as long as his actions "could reasonably have been thought consistent with the rights he was alleged to have violated." <u>Anderson v. Creighton</u>, 483 U.S. 635, 638 (1987); <u>Waldrop v. Evans</u>, 871 F.2d 1030, 1033 (11th Cir. 1989).

Now, with the development of certain facts in this case, it is clear Connors never participated in any teleconferences or multidisciplinary meetings involving Plaintiff or any other inmate during his career. ECF No. 83-6, p. 3. Plaintiff testified that she never met Defendant Connors and did not know whether Connors was even a doctor but believed that he had the final authority to grant a request for surgery. ECF No. 83-16, pp. 58-59.

Contrary to the allegation in the operative complaint, Connors only "review[ed] and sign[ed] the Central Office response to Plaintiff's

administrative remedy appeal in Administrative Remedy Number[s] 908238-A1 and . . . 933147-A1." ECF No. 83-6, p. 3. Neither response denied Plaintiff's request for surgery. ECF No. 1-1., pp. 10-11. In appeal 908238-A1, Plaintiff claimed that Dr. Estes "made clear that these surgery requests are medically necessary treatment . . . and should be performed as soon as possible."[15] Id., p. 10. On November 6, 2017, Connors responded to 908238-A1 and informed Plaintiff (1) her "request [was] pending the decision of the TCCT, and [she would] be notified when a decision has been made," (2) the decision was deferred to the TCCT, (3) the "response was provided for informational purposes only." ECF No. 89-3, p. 10; see also ECF No. 1-1, p. 14.[16] In appeal 933147-A1, Plaintiff claimed that the BOP clinical guidelines and criteria is contrary to the community standards as set forth in the WPATH, and complained she was denied transfer to a female prison. ECF No. 83-3. Plaintiff did not appeal the denial of surgery in this grievance. Id. On August 1, 2018, Connors responded that BOP "developed a Transgender Resource Guide," the "committee reviewed" Plaintiff's case and disapproved

---

[15] Although Dr. Estes recommended surgery, he testified that surgical intervention "was medically an option. These are surgeries that are performed by choice . . . an acceptable choice" for Plaintiff not "medically necessary." ECF No. 83-11, p. 12. Dr. Estes explained that the surgeon does not make the sole determination but "a team . . . a consort of doctors" collectively make a determination "to be sure that . . . yes, this is correct, this is the right thing to do for this patient." Id., p. 10.

[16] Duplicate copies of record.

Page 22 of 35

her transfer, and there was no evidence to substantiate a claim of being denied appropriate medical care. ECF No. 83-2, p. 1.

It is unreasonable to assume that Connors – who is not a medical professional – had the authority to somehow override the medical team's denial of a surgical procedure or direct that surgery be performed while the medical team's decision was pending. ECF No. 83-16, pp. 80-81. Connors was never personally responsible for Plaintiff's medical treatment (or lack thereof) and was not present during any teleconferences or multidisciplinary meetings for Plaintiff or any other inmate. ECF No. 83-6, p. 3. Connors' only involvement was to review and sign the Central Office response to Plaintiff's grievance appeals in 908238-A1 and 933147-A1. Id. Connors has no medical expertise and, therefore, is not involved in determining what medical care a particular inmate receives. Id. Moreover, Plaintiff testified that Connors was never present at any TCCT meeting and claims that she sued the John Does because the TCCT had the authority to either grant or deny the surgery. ECF No. 83-16, pp. 53, 55. Connors is not a member of the TCCT; he is the National Inmate Appeals Administrator. ECF No. 83-6.

Nowhere in the record has Plaintiff presented evidence establishing that Connors was personally involved in any of the decisions to deny surgery. The only evidence of Connors' involvement was at an administrative level --

in no way a deciding factor on the denial of surgery. The inferences to be drawn from the underlying facts are to be made in the light most favorable to Plaintiff when considering a motion to dismiss. However, at the summary judgment stage, a jury could not reasonably infer that Connors should have known that his conduct violated Plaintiff's constitutionally protected rights. Without evidence establishing Connors' involvement in the denial of the surgery, the allegation in the complaint is pure speculation. As a matter of law, the claim against Connors cannot proceed.

C. The Claim Against Defendant Barr Fails Because Gender Dysphoria is Expressly Excluded under The Rehabilitation Act.

Plaintiff cannot show that she is a qualified individual with a disability under the Rehabilitation Act. Title II of the ADA provides "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. With nearly identical language, the Rehabilitation Act provides that

> No otherwise qualified individual with a disability in the United States, as defined in section 7(20) [29 USCS § 705(20)], shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]

29 U.S.C.§ 794(a). Thus, the elements for stating a claim for disability discrimination are the same under either statute. Plaintiff "can also show discriminatory intent under either statute by showing deliberate indifference under the Eighth Amendment." Liese v. Indian River Cty. Hosp. Dist., 701 F.3d 334, 345 (11th Cir. 2012).

The standards used to determine whether this section has been violated in a complaint alleging refusal to approve surgery under this section shall be the standards applied under the Americans with Disabilities Act (ADA). However, the Rehabilitation Act expressly excludes "transvestism, transsexualism . . . [and] gender identity disorders not resulting from physical impairments" from the definition of disability. 29 U.S.C. § 705(20)(F)(i). Gender dysphoria, as a gender identity disorder, is specifically exempted as a disability by the Rehabilitation Act.

A majority of courts find that both disabling and non-disabling gender identity disorders that do not result from a physical impairment are excluded from the ADA. See Parker v. Strawser Constr., Inc., 307 F. Supp. 3d 744, 753-54 (S.D. Ohio 2018); Michaels v. Akal Sec., Inc., 2010 U.S. Dist. LEXIS 62954, 2010 WL 2573988, at *6 (D. Colo. June 24, 2010) ("Gender dysphoria, as a gender identity disorder, is specifically exempted as a disability by the Rehabilitation Act"); Gulley-Fernandez v. Wis. Dep't of Corr.,

2015 U.S. Dist. LEXIS 161623, 2015 WL 7777997, at *2 (E.D. Wis. Dec. 1, 2015) ("gender identity disorder is not a 'disability' under the Americans with Disabilities Act or the Rehabilitation Act."); Mitchell v. Wall, 2015 WL 10936775, at *1 (W.D. Wis. Aug. 6, 2015) (gender identity disorders expressly excluded from coverage under the ADA); Diamond v. Allen, 2014 U.S. Dist. LEXIS 160648, 2014 WL 6461730, at *4 (M.D. Ga. Nov. 17, 2014) (order adopting the Report recommending dismissal, in part, because gender identity disorders that do not result from physical impairments are not disabilities under the ADA); Kastl v. Maricopa Cty. Cmty. Coll. Dist., 2004 WL 2008954, at *4, *4 n. 2 (D. Ariz. June 3, 2004) (equating "gender identity disorder" and "gender dysphoria" and holding them to be expressly excluded from definition of "disability"). Courts following this approach have tended to presume that a plaintiff's gender dysphoria or other gender identity disorders do not result from any condition that could be considered a "physical impairment."

Plaintiff claims she "was born a male"; knew "she has a female gender identity since . . . childhood"; "began living full time as a woman," in 2008; and started using hormones prior to incarceration. ECF No. 40, p. 9. Plaintiff "was not formally diagnosed with gender dysphoria prior to her incarceration" and did not have "any developed female parts." ECF No. 86, p. 4. Prior to

incarceration, Plaintiff was "taking hormones . . . purchased online and over-the-counter."[17] Id. Dr. Moorehead diagnosed Plaintiff with gender dysphoria in 2014. Plaintiff articulated no facts that she sought medical treatment for gender dysphoria before her incarceration. At no point during this litigation has Plaintiff argued that her gender dysphoria results from any physical impairment. It would be improper for the Court to assume that Plaintiff can prove facts she has not alleged.[18] Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 526 (1983); Quality Foods de Centro America, S.A. v. Latin Am. Agribusiness Dev. Corp., S.A., 711 F.2d 989, 995 (11th Cir. 1983). Even if Plaintiff maintains that she can properly allege discriminatory intent by claiming deliberate indifference to a serious medical need, such reliance is misplaced for the reasons stated below.

D. Plaintiff Cannot Establish Deliberate Indifference to a Serious Medical Need under the Eighth Amendment.

As articulated above, discriminatory intent can be established where there is deliberate indifference to a serious medical need in violation of the

---

[17] Plaintiff informed Dr. Joubert that she wanted to take prenatal vitamins, testosterone blockers, and estrogen patches "like [s]he was doing on the street from Amazon.com." ECF No. 83-1, p. 1.

[18] Plaintiff had an adequate opportunity to amend her pleading and add factual allegations.

Eighth Amendment. Delayed or denied access to medical care for inmates resulting in physical or mental injury constitutes a violation of constitutional rights. Estelle v. Gamble, 429 U.S. 97, 103-05 (1976).

To sufficiently state a claim, a plaintiff must allege facts that plausibly show: (1) the plaintiff had a serious medical need; (2) the defendant was deliberately indifferent to that need; and (3) there is a causal connection between that indifference and the plaintiff's injury. Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1306-07 (11th Cir. 2009). The medical need must be "one that, if left unattended, pos[es] a substantial risk of serious harm." Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003) (citations and internal quotation marks omitted). "However, not 'every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment.'" McElligott v. Foley, 182 F. 3d 1248, 1254 (11th Cir. 1999).

A deliberate-indifference claim contains both an objective and a subjective component. Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004). First, the need must be "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention," which "if left unattended, poses a substantial risk of serious harm." Id. Second, the defendant must have (1) subjective knowledge of a risk of serious harm; (2)

disregarded that risk; and (3) by conduct that is more than mere negligence. Id., (citing McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999)). Deliberate indifference is the reckless disregard of a substantial risk of serious harm. Farmer, 511 U.S. at 835-36.

"[A] simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment (fails to) support a claim of cruel and unusual punishment." Keohane v. Fla. Dep't of Corr., Sec'y, 952 F.3d 1257, 1266 (11th Cir. 2020) citing Harris v. Thigpen, 941 F.2d 1495,1510 (11th Cir. 1991). As articulated in Estelle, "whether . . . additional diagnostic techniques or forms of treatment - is indicated is a classic example of a matter for medical judgment" and "[a] medical decision not to order" additional testing, "does not represent cruel and unusual punishment." 429 U.S. at 107. It is undisputed that GD is a serious medical need, to which this Court is not unsympathetic.

Nonetheless, based on bedrock principle, Plaintiff's deliberate indifference claim is ill-fated -- both on the merits and as evidence of discriminatory intent. The law is clear. Plaintiff is not constitutionally entitled to receive "all" forms of treatment or even "the best treatment" available for gender dysphoria. Even if Plaintiff was informed by her physicians that she was a "good candidate for the surgery" or that surgery was an "acceptable

choice," the BOP's denial of surgery may not constitute a constitutional violation. <u>See</u> ECF Nos. 83-1, p. 940; 83-11, p. 12.

The Eleventh Circuit has repeatedly addressed GD. In <u>Keohane</u>, there was no Eighth Amendment violation where the prison refused to accommodate the inmate's social transitioning requests because this was a matter of differing medical opinions as to the proper course of treatment and the requests presented serious security concerns. "For better or worse, prisoners aren't constitutionally entitled to their preferred treatment plan or to medical care that is great, 'or even very good.'" <u>Keohane</u>, 952 F.3d at 1277 (citing <u>Harris</u>, 941 F.2d at 1510). Courts should not second-guess a medical professional's opinion regarding the propriety of a particular course of treatment. <u>See</u> <u>Waldrop v. Evans</u>, 871 F.2d 1030, 1033 (11th Cir. 1989); <u>see also</u> <u>Kothmann v. Rosario</u>, 558 F. App'x 907, 911 (11th Cir. 2014) (recognizing gender identity disorder as a serious medical need).

In <u>Kothmann</u>, the Eleventh Circuit found that the following factual allegations were sufficient to state a claim of deliberate indifference to an inmate's GD condition by the defendant medical professional:

> [that] (1) [i]n the medical community, hormone therapy is the medically recognized, accepted and appropriate treatment for GID; (2) [the medical professional defendant] knew of [the plaintiff's] GID diagnosis, his hormone treatment history, and his medical need for continued hormone treatment; and (3) [the medical professional

> defendant] knowingly refused to provide [the plaintiff] with
> his medically necessary hormone therapy for his GID.

558 F. App'x at 911. The Kothmann decision presented at the Rule 12(b)(6) stage. However, the Eleventh Circuit refused to decide whether hormone treatment was medically necessary to treat the prisoner's GD or whether other types of treatment would be adequate. Still, the defendant's failure to provide any treatment to the plaintiff was sufficient to support an Eighth Amendment claim because the plaintiff alleged facts sufficient to show that hormone treatment was recognized, accepted, and medically necessary treatment for GD. Id.

Where the inmate has received medical attention and the dispute is over the propriety of that course of treatment, courts should be reluctant to question the accuracy or appropriateness of the medical judgments made. Harris v. Thigpen, 941 F.2d 1495, 1507 (11th Cir. 1991). Moreover, courts facing the same issue involved in this case have consistently held that the Eighth Amendment does not entitle a prison inmate to a particular type of curative treatment [(i.e., estrogen therapy followed by sex reassignment[19] surgery)], for GD. See Maggert v. Hanks, 131 F.3d 670, 672 (7th Cir. 1997). This is the case here. If the Eleventh Circuit refused to find hormone

---

[19] Courts have used the terms sex reassignment surgery and gender-affirming surgery interchangeably.

treatment or social transitioning accommodations medically necessary in previous cases, then this Court should refrain from making the determination that surgical intervention was necessary in Plaintiff's case.

The Eleventh Circuit's decisions in Keohane and Kothman are binding on this Court. See Martin v. Singletary, 965 F.2d 944, 945 n.1 (11th Cir. 1992) (holding that "the courts in this circuit" have a duty to apply the binding precedent established by published opinions even before a mandate issues). Furthermore, there is no medical consensus to support surgery for the treatment of GD. According to the Department of Health and Human Services:

> there is no medical consensus to support one or another form of treatment for gender dysphoria. In the Department's current view, the 2016 Rule did not give sufficient evidence to justify, as a matter of policy, its prohibition on blanket exclusions of coverage for sex-reassignment procedures . . . [T]he 2016 Rule relied excessively on the conclusions of an advocacy group (WPATH) rather than on independent scientific fact-finding -- such as the fact-finding that [Centers for Medicare and Medicaid Services] undertook in deciding to not issue a National Coverage Determination with respect to sex-reassignment surgeries (as discussed above) due to insufficient proof of medical necessity. In addition, commenters identify a lack of clarity in the 2016 Rule's mandate, because of the lack of medical consensus as to what is even encompassed within "gender transition procedures" (e.g., whether they include facial reconstruction or hair transplants). All these are further reasons why, as a matter of policy, **Federal civil rights law should not be used to override providers' medical**

> **judgments regarding treatments for gender dysphoria**.[20] (Emphasis added).

At the initiation of this case, the matter of whether surgery was a medical necessity to address GD was undecided. <u>See</u> ECF No. 58, p. 27 ("At this point in the case, the Court cannot say that gender dysphoria falls within the RA's exclusionary language and will err on the side of caution to allow Plaintiff's claim to proceed"). However, since that time, the Fifth Circuit Court of Appeals addressed the same question presented here – whether the denial of sexual reassignment surgery for a transgender inmate violated the Eighth Amendment.[21] The Fifth Circuit Court of Appeals dismissed the case at the Rule 12(b)(6) stage:

> Williams asks us to hold that gender dysphoria is a serious medical condition whose proper treatment consists of both hormonal therapy and sex reassignment surgery. But that plea is foreclosed by our recent holding in <u>Gibson v. Collier</u>, 920 F.3d 212, 215 (5th Cir.), cert. denied, 140 S. Ct. 653, 205 L. Ed. 2d 384 (2019), that "[a] state does not inflict cruel and unusual punishment by declining to provide sex reassignment surgery to a transgender inmate."

---

[20] Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority, Alex M. Azar II, Sec'y, Health and Human Services, 85 Fed. Reg. 37160, 37198 (May 20, 2020).

[21] Fifth Circuit decisions issued before October 1, 1981, are binding on the Eleventh Circuit. <u>Bonner v. City of Prichard, Ala</u>., 661 F.2d 1206, 1209 (11th Cir. 1981). Although the Fifth Circuit's later decisions are not binding precedent, they are particularly persuasive authority where the Supreme Court of the United States has denied certiorari.

<u>Williams v. Kelly</u>, 818 F. App'x 353, 354 (5th Cir.) cert. denied, 141 S. Ct. 678 (Nov. 2, 2020). A "deliberate indifference claim rings hollow" when prison officials attempted and offered to correct the gender dysphoria through hormonal therapy, which Plaintiff admits is a known course of treatment. <u>Id</u>. Plaintiff admitted hormonal therapy remains part of her regimen, even after she had full gender-reassignment surgery – surgery she never requested from BOP. It follows then that an orchiectomy and breast augmentation were not the only viable options for Plaintiff.

The instant case involves Plaintiff's requests for specific, limited surgery -- an orchiectomy and breast augmentation. It is undisputed that Plaintiff received psychiatric treatment, medication treatment, hormonal treatment, female clothing, breast forms, hair care products, permission to wear makeup and was referred to off-site consultations with a private OB-GYN, an endocrinologist, and surgeons. BOP offered to house Plaintiff with female prisoners; however, Plaintiff rejected the offer. Some delays were due to Plaintiff's personal decisions. Plaintiff was not mentally or emotionally ready to transfer to a female facility and was not ready submit to full gender-reassignment surgery. ECF No. 86, pp. 4-5.

The only treatment Plaintiff wanted and did not receive was surgical intervention. If gender dysphoria is a disability (and the court makes no such

finding here because it is specifically excluded from the Rehabilitation Act for the reasons stated above), Plaintiff may be entitled to reasonable accommodations. However, she is not entitled to every possible accommodation. Plaintiff does not deny that the treatments she received were proper to address her medical condition. Therefore, as a matter of law, Plaintiff's allegations do not support her discrimination claim and, on the merits, do not rise to the level of a constitutional violation. Plaintiff's Eighth Amendment claims against Defendants fail.

## VI.     Conclusion and Recommendation

For the reasons stated, it is respectfully **RECOMMENDED** that

1.  Defendants' Motion for Summary Judgment for failure to state a claim, pursuant to 28 U.S.C. § 1915(e)(2), ECF No. 82, be **GRANTED**.

2.  Plaintiff's Motion for Summary Judgment, ECF No. 86, be **DENIED**.

3.  The claims against the John Doe defendants be **DISMISSED** without prejudice for failure to prosecute pursuant to Fed. R. Civ. P. 41(b).

4.  The case be closed.

IN CHAMBERS at Tallahassee, Florida, on September 24, 2021.

**s/ Martin A. Fitzpatrick**
**MARTIN A. FITZPATRICK**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations. Fed. R. Civ. P. 72(b)(2). A copy of the objections shall be served upon all other parties. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Fed. R. Civ. P. 72(b)(2). Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control. If a party fails to object to the Magistrate Judge's findings or recommendations as to any particular claim or issue contained in this Report and Recommendation, that party waives the right to challenge on appeal the District Court's order based on the unobjected-to factual and legal conclusions. See 11th Cir. Rule 3-1; 28 U.S.C. § 636(b)(1)(C).