## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**CHRISTOPHER SHORTER[1],**

    **Plaintiff,**

**vs.**                **CASE NO.: 4:19-CV-108-WS-MAF**

**MERRICK B. GARLAND, in his
official capacity as the Attorney
General of the United States
and Director of the United States
Department of Justice; et al.,**

    **Defendant.**
_____/

## <u>REPORT AND RECOMMENDATION</u>

Chrissy Shorter, a former inmate, alleged disability-discrimination and failure-to-accommodate claims under Section 794(a) of the Rehabilitation Act (RA) when the Bureau of Prisons (BOP) denied her request for an orchiectomy and breast augmentation to treat gender dysphoria (GD).[2] ECF

---

[1] Shorter changed her name on November 13, 2019, and is now known as Chrissy Noelle Shorter. ECF No. 83-16, p. 7.

[2] Shorter was born male and identifies as female; therefore, female pronouns are used.

According to Johns Hopkins Medicine, the "surgery involves removing the testicle and spermatic cord where it exits the body." It is most often performed to prevent cancer from spreading. *Radial Orchiectomy*, JOHN HOPKINS MEDICINE (2022), https://www.hopkinsmedicine.org/health/conditions-and-diseases/testicular-cancer/radical-orchiectomy. Accessed: Feb. 24, 2022.

No. 43. The Attorney General [AG] moved for summary judgment seeking dismissal of Shorter's claims. ECF No. 82. The Court returned the case to the Undersigned "to consider" whether Shorter "establish[ed] either a disability-discrimination claim or a failure-to-accommodate claim"; and, if so, what relief she "might receive *if* she prevails."[3]  ECF No. 94, pp. 5-6. After careful review and consideration, it is recommended that the Court find Shorter's RA claims fail as a matter of law; and summary judgment should be granted in the AG's favor.

## I.   Defendant's Motion for Summary Judgment, ECF No. 82

The AG argues Shorter's discrimination claims are meritless and equitable remedies are improper. ECF No. 82, pp. 28-36. The BOP did not deny Shorter "medical care for any reason and especially not for being transgender." Id., p. 28. Shorter is entitled to a reasonable accommodation but not an accommodation of her choice. Id., p. 29. The AG detailed the medical and non-medical accommodations made for Shorter's GD from 2014 through 2019.[4] Id., pp. 3-12, 26-27, 29-32.

---

[3] The Court adopted the prior Report and Recommendation (ECF No. 92), in part, and dismissed Eighth Amendment claims against Defendant Connors and the John Doe defendants (Count II). ECF No. 94. Only Count I remains.

[4] Shorter was incarcerated in the BOP from July 2012 through February 14, 2019. ECF No. 82, p. 3.

A BOP physician first diagnosed Shorter with GD in 2014. Id., p. 3. BOP authorized for Shorter the purchase of breast forms, hair care products, and female undergarments. Id., pp. 3-5, 29-32. At each prison, Shorter had single-cell housing accommodations. Id. See also ECF No. 87-12, p. 2. BOP authorized exceptions for visual searches, private showers with full doors, and offered Shorter a transfer to a female facility "to gain living experience in her chosen gender." Id.

The AG argues that Shorter did not gain approval for gender-affirming surgery because surgery was an option and because clinical guidelines required her to live in her chosen identity at least one year prior to surgery. Despite recommending and prescribing surgery, Dr. Angueira testified that surgery, hormone treatments, and vaginoplasty were all medical options. Id., pp. 6-9, 31-32. Dr. Angueira wrote a prescription and claimed the surgery was necessary only because Shorter wanted the surgery and had GD. Id. Dr. Estes never recommended surgery. Dr. Estes also required letters from mental health providers confirming the GD diagnosis and need for permanent surgery, but Shorter never provided them. Id. In 2016, Shorter refused a transfer to a female prison; in 2017, she asked for a hold to prevent the transfer; and in 2018, with less than one year remaining on her sentence, she was amenable to a transfer. Id., pp. 3-4, 30.

No BOP physician offered to provide the surgery Shorter wanted; and her mental health did not deteriorate from not having the surgery. Id., pp. 6-9, 31-32. Shorter was a Mental Health Level II Inmate from the time she arrived at FCI-Miami in 2016 until the time of her release in 2019 and was never a suicide risk. Id., pp. 12, 32.

BOP provided Shorter with the following medical treatment for her GD: hormone therapy, psychological and psychiatric care, medications, and consultations with private transgender care specialists and plastic surgeons. Id., pp. 3-7, 30. The only treatment Shorter did not receive was the specific request for an orchiectomy and breast augmentation she claims was medically necessary. Id., pp. 3, 31.

The AG relies on Lane v. Pena, 518 U.S. 187 (1996) and argues that even if Shorter prevailed, monetary damages against executive branch agencies are excluded from the remedies provision of the RA; and there is no waiver of sovereign immunity. Id., pp. 32-33. While a plaintiff might be entitled to equitable remedies, it is improper in this case because Shorter is not in BOP custody. Id., p. 35.

## II.    Shorter's Response, ECF No. 90

Shorter argues the denial of her repeated requests and physician recommendations for surgery violates the RA because hormone therapy was

contraindicated given "her significant medical history including cancer and her own lumpectomy," and because "it did not work." ECF No. 90, pp. 33-34. Shorter dismisses all non-medical accommodations provided by BOP because they were not prescribed by a physician. Id., p. 34.

Shorter could not get supporting letters from mental health providers while she was in BOP custody but does not explain why this is so when BOP psychologists and psychiatrists provided her care. Id., pp. 34-35. According to Shorter, the inability to secure supporting letters cannot justify BOP's failure to accommodate the surgical request. Id., p. 35. Shorter maintains BOP should not have required her to live in a women's prison for one year to meet the guidelines because she already lived as a woman from 2008 until her federal incarceration in 2012. Id. Finally, Shorter argues that Lane v. Pena does not deny her equitable relief or attorney's fees. Id., p. 36.

## III. Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is proper:

> [i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

Accordingly, summary judgment should be entered only against

> a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (citations omitted).

Thus, pursuant to Celotex and its progeny, a movant for summary judgment bears the initial responsibility of informing the court of the basis for her motion by identifying those parts of the record that demonstrate the nonexistence of a genuine issue of material fact. This demonstration need not be accompanied by affidavits. Hoffman v. Allied Corp., 912 F.2d 1379, 1382 (11th Cir. 1990). If the party seeking summary judgment meets the initial burden of demonstrating the absence of a genuine issue of material fact, the burden shifts to the non-moving party to present sufficient evidence to rebut this showing with affidavits or other relevant and admissible evidence. Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991).

It is the non-moving party's burden to come forward with evidence on each essential element of her claim sufficient to sustain a jury verdict. Earley v. Champion Int'l Corp., 907 F.2d 1077, 1080 (11th Cir. 1990). The non-

moving party cannot rely solely on her complaint and other initial pleadings to contest a motion for summary judgment supported by evidentiary material, but must respond with affidavits, depositions, or otherwise show there are material issues of fact which demand a trial. Fed. R. Civ. P. 56(e); Coleman v. Smith, 828 F.2d 714, 717 (11th Cir. 1987). The trial judge, at the summary judgment stage, does not weigh the evidence but rather determines whether there is a genuine issue for trial: "if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); Baldwin Cty., Ala. v. Purcell Corp., 971 F.2d 1557, 1563 (11th Cir. 1992). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing Anderson, supra).

The Supreme Court has stressed:

> [w]hen the moving party has carried its burden under rule 56(c) its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'

Matasushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (footnote omitted). "[T]he mere existence of some alleged factual

dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." <u>Anderson</u>, 477 U.S. at 247-48. Finally, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007).

## IV.   Shorter's Medical Treatment for Gender Dysphoria (GD)

Before proceeding to the legal analysis, certain medical records warrant discussion.[5] Parties do not dispute that, for approximately five years, BOP provided Shorter with regular medical care for GD including testosterone blockers; hormone therapy; medications; psychology services; and multiple visits to private providers including an OB-GYN and endocrinologist.[6] The only surgery Shorter requested was an orchiectomy and top surgery. After release from prison, Shorter obtained *full* gender-affirming surgery (breast augmentation and vaginoplasty) and restarted

---

[5] Shorter's extensive medical record relating to her GD was outlined in previous Reports. <u>See</u> ECF Nos. 58, 92.

[6] BOP outsourced Shorter's care to Dr. Angueira an endocrinologist; Dr. Estes, an OB/GYN; and referrals were made to surgeons Dr. Chris Salsado and Dr. Gregory Dowbak. <u>See</u> ECF No. 83-1, pp. 834, 854. Shorter was released from prison on February 14, 2019.

hormone therapy. ECF No. 83-16, pp. 47, 129-33. Shorter's care is presented chronologically.

A. <u>2014 - 2015</u>

After being in BOP custody for two years, on July 23, 2014, one week prior to a scheduled transfer, Shorter informed Melissa Forsyth, FCI-Jesup's chief psychologist, she wanted hormone therapy information as outlined in BOP policy. ECF No. 83-1, p. 90. This was the first time Shorter told psychology services she previously lived as a female and used estrogen, testosterone blockers, and prenatal vitamins prior to incarceration. Id.

Shorter transferred to FCI-Oakdale on September 3, 2014, "on no medications." ECF No. 83-1, p. 107. Two days later, Shorter submitted a request to health services and Dr. Barbara Moorehead:

> I live/suffer from Gender Identity Disorder. When I was on the streets I lived as a woman. I was taking estrogen in vari[ous] forms and testosterone blockers . . . Finasteride, Spironolactone (50 mg), Estrogen Patches (0.1 mg) Alora Brand, Premarin Cream, Prempro, Estratab, Climara, Estrace, Estraderm, Ogen, Estinyl, and Estrovis . . . in some combination over a 5 year period. I would like to start back taking these drugs . . . in whatever combination your professional judgment tells you is best for me.

ECF No. 83-1, p. 108. Shorter cited Program Statement 6031.04 Patient Care which provides authority for the prescriptions. Id. In October 2014,

Shorter was diagnosed with GD and began hormone therapy.[7] ECF Nos. 87-10, pp. 3-4; 87-14, p. 2. Shorter testified she was not previously diagnosed with GD. ECF No. 83-16, p. 19. In December 2014, Shorter told Dr. Alexandre she would have surgery (for GD) once released from prison. ECF No. 83-1, p. 12.

In January 2015, Shorter met with Dr. Ava Joubert and requested prenatal vitamins, testosterone blockers, and estrogen patches "like [s]he was doing on the street from Amazon.com." ECF No. 83-1, p. 1. In August 2015, the chief psychologist directed Anna Rehwinkel, Psy.D, to ask Shorter if she preferred a male or female institution; Shorter preferred a male prison. ECF No. 87-12, p. 2. In December 2015, after more than one year on hormone therapy, Shorter had "no problem[ ]" with the treatment and informed the doctor that, in 2008, "she was in the process [of] contemplat[ing] . . . sex change surgery." ECF No. 83-1, pp. 126, 131. On December 4, 2015, Shorter requested a change to estrogen pills because patches caused skin irritation; and Dr. Li issued the prescription. ECF No. 83-1, p. 131.

---

[7] Dr. Moorehead, the chief psychologist at FCI-Oakdale, noted Shorter began wearing female clothing, hair, and make up, and using over-the-counter drugs (estrovent, primpro, primeron) in 2007. ECF No. 87-10, p. 3; see also ECF No. 87-11, p. 2.

B. <u>2016 - 2017</u>

In January 2016, Dr. Alarcon noted Shorter "is doing well on [her] treatment plan, Zoloft and hormonal therapy for transgender disorder." ECF No. 83-1, p. 121. The regimen included Estradiol (1 mg) and Spironolactone (100 mg). <u>Id.</u> On April 4, Dr. Cornett, requested a consultation for Shorter with Dr. Angueira. <u>Id.</u>, pp. 497-98. On April 20, when Dr. Cornett advised that the "orchiectomy would not stop the body's production of testosterone," Shorter became "more receptive to hormone therapy" as a "primary intervention."[8] ECF No. 87-13, pp. 2-4. The same day, Shorter reported to Dr. Alarcon she wanted "natural breasts" and remained on hormonal therapy. ECF No. 87-14, p. 2. By this time, Shorter was on "Estradiol 2 mg." ECF No. 83-1, p. 483.

Just two days later, on April 22, Shorter reported to Vivian Torres, Psy.D., her "frustrat[ion] with her perceived lack of treatment" but understood she "had to see the endocrinologist. What I want is the breast augmentation and castration." ECF No. 87-19, p. 2. Although Shorter had "frequent thoughts of self-castration . . . she denied engaging in any self-harm" or any intent to do so. ECF No. 87-20, pp. 4-5. Four days later, on April 26, Shorter

---

[8] Dr. Todd Cornett is a BOP psychiatrist at FCI-Miami. ECF No. 87-13, pp. 2-4. Also, on this date, there is a surgery referral to Dr. Chris Salsado. ECF No. 83-1, p. 854.

was referred to Dr. Torres for suicidal ideation and an excessive mental preoccupation with genital mutilation and self-castration. Id., p. 2. Dr. Torres noted Shorter's last incident of self-harm occurred in 2008, four years prior to her incarceration.[9] Id., p. 3. During the session, Shorter denied "current suicidal ideation, intent, or plan," in part, because of her religious beliefs, and confirmed that individual and group therapy helped her be more mentally stable. Id., pp. 3-5. Shorter then qualified her surgical request: "I'm not even asking for the full reassignment surgery because I don't trust BOP to do it right. I just want my testicles to be removed so I can stop the hormones." Id., p. 4. Shorter again stated she did not want a transfer to a female prison because she feared ridicule and was "just not mentally there right now." Id. Ultimately, there were no indications Shorter should be on suicide watch. Id., p. 5. Shorter admitted at deposition that she did not attempt suicide while in BOP custody and dealt with suicide ideation through counseling, at some point weekly or bi-weekly. ECF No. 83-16, pp. 23-25.

---

[9] Dr. Alexander noted in the medical record that Shorter's history of suicide attempts occurred from 2000 to 2005, according to the pre-sentence investigation report, well before her incarceration. ECF No. 83-1, p. 85. In April 2014, in a psychosocial interview, Shorter reported the suicide attempts occurred in 2000, 2003, and 2005. ECF No. 83-1, p. 93. There is no indication in the BOP medical records that Shorter was ever at risk of self-harm or suicide during her incarceration.

On July 8, Shorter expressed her cancer fears to Dr. Torres. ECF No. 87-18, p. 2. She denied suicidal ideation. Id. On August 18, in a session with Sherri Skibinski, Psy.D., Shorter explained her fears related to a breast cancer gene (BRCA1 and/or BRCA2), a Klinefelter Syndrome diagnosis[10], and family deaths resulting from breast cancer including her sister who died in May 2014. ECF No. 87-17, p. 2. Shorter was not suicidal. Id. Shorter never had a cancer diagnosis, but a lump grew in her right breast. On September 22, BOP doctors performed a right breast lumpectomy and biopsy, which was "[n]egative for malignancy, [p]ositive for lobular hyperplasia," ECF No. 83-1, p. 444. It is worth noting that, during deposition, Shorter recanted her Klinefelter syndrome diagnosis, "I'll be honest, I have not been tested for Klinefelter syndrome." ECF No. 83-16, p. 47.

On October 14, Shorter repeated her cancer fears to Dr. Torres, but she was "not willing to discontinue the hormone replacement therapy . . . if the government is unwilling to provide her with . . . surgery."[11] Id. Shorter

---

[10] According to the Mayo Clinic, "Klinefelter syndrome is a genetic condition that results when a boy is born with an extra copy of the X chromosome . . . may also cause reduced muscle mass, reduced body and facial hair, and enlarged breast tissue. The effects of Klinefelter syndrome vary, . . . not everyone has the same signs and symptoms." https://www.mayoclinic.org/diseases-conditions/klinefelter-syndrome/symptoms-causes/syc-20353949. Accessed Feb. 24, 2022.

[11] Medical records indicate that Shorter was transferred to FCI-Miami around December 2015. ECF No. 83-1, pp. 121-22. Shorter was evaluated by Dr. Alarcon in January 2016 and was noted as doing well with her hormonal treatment plan. Id.

denied thoughts of self-harm. Id. On October 28, Shorter's BRCA1 and BRCA2 tests confirmed "[n]o [m]utation." ECF No. 83-1, pp. 1249, 1252.

On February 21, 2017, the psychiatrist noted "estrogen was stopped due to side effects . . . including possibly the two breast lumps." ECF No. 83-1, p. 883. Shorter also reported other symptoms to Dr. Skibinski (heart palpitations, numbness down her side, etc.). Id., p. 992. Dr. Skibinski suggested these may be the result of a panic attack and not a heart problem, but Shorter disagreed. Id.

On April 20, Shorter visited Dr. Estes complaining there was "very little difference in her symptoms" within seven days of starting Finasteride. ECF No. 87-6, p. 2. She was happy with Vaniqa for suppressing unwanted hair growth but still wanted the orchiectomy and breast augmentation. Id., pp. 2-3. Dr. Estes explained it "was far too soon to see significant change in her hormonal profile," the dosage should not be altered, and should continue for four to six weeks. Id. Dr. Estes noted, "[o]verall . . . [Shorter] state[d] that her gender dysphoria was somewhat improved, however is not optimal." Id., p. 2. Dr. Estes outlined the process but made no recommendation for surgical intervention. Id. Dr. Estes advised Shorter that an orchiectomy is permanent; so, two letters from mental health professionals were required to

_____

confirm her "gender dysphoria, . . . which warrants [surgery] and [that she] is an appropriate candidate for permanent general surgery." Id. The letters should be obtained early "so that when it is [an] appropriate time [for Dr. Estes] to make the referral for surgery, [Shorter]" would be "ready to go." Id.

In July 2017, observing no change in hormone levels, Dr. Estes increased the dosage for Finasteride, continued Spironolactone, set a follow-up appointment for six weeks, and noted Shorter was a poor candidate for hormone treatment "due to history." ECF No. 87-7, p. 2. Dr. Estes opined that an orchiectomy would improve the hormonal profile and Shorter "needs referral to plastic surgeon for a full consultation regarding surgical options." Id. Shorter never obtained the letters. At deposition, Shorter alleged the psychiatric department refused to write the letters. ECF No. 83-16, p. 34.

In July, September, and October, the endocrinologist requested a plastic surgery consult with Dr. Gregory Dowback for an orchiectomy. ECF No. 83-1, pp. 810, 817, 819, 828. Shorter was never sent to Dr. Dowbak. ECF No. 83-16, p. 36.

C. 2018 - 2019

In January 2018, Dr. Angueira evaluated Shorter and recommended surgery was the best treatment given the adverse effects from medical therapy; he also prescribed Lupron for chemical castration. ECF No. 83-1,

pp. 1410-13. <u>See also</u> Dr. Angueira's deposition, ECF No. 83-12, p. 34. The last time Dr. Angueira examined Shorter was two years earlier. ECF No. 83-12, p. 13. On April 24, Shorter's endocrinology consult was disapproved in part because there was poor clinical documentation and there were no side effects of Lupron. <u>Id.</u>, p. 1266. Then, from April through May, Shorter alleged complications from Lupron therapy: "chest pain, hot flashes, night sweat, nausea" and vomiting after injections. ECF No. 83-1, pp. 1248, 1254, 1260, 1263, 1269. Her EKG was normal, but Shorter insisted it was related to Lupron. <u>Id.</u>, p. 1248.

On June 1 and June 11, Shorter asked Dr. Torres for a letter for surgery, but Dr. Torres said that was a matter for the acting chief psychologist; and directed Shorter to contact the TEC with her request. <u>Id.</u>, pp. 1344, 1345. On June 13, Dr. Alarcon conducted a chart review and noted that Shorter had a "poor response to estrogenic therapy, evidenced by poor suppression testosterone level on estradiol" and adding she "has bilateral gynecomastia with right breast biopsy positive for florid lobular hyperplasia . . . interpreted as" having a breast cancer risk "1 ½ to 2 times" greater than "that of a woman with no breast abnormalities." ECF No. 83-1, p. 1234. On June 14, Shorter asked Alexandra Burgos, Psy.D., for a letter of

referral for surgery; and she reminded Shorter the request was submitted to TEC for guidance and to direct her inquiries to TEC. ECF No. 83-1, p. 1342.

On July 9, during a session with Dr. Torres, Shorter "was feeling 'good' after returning from the endocrinologist" visit on July 6. ECF No. 83-1, p. 1341. Shorter stated the endocrinologist recommended the orchiectomy because "I've been having side effects to the medication. Surgery is the best practice." Id.

On November 2, three months before she was released, Shorter visited Dr. Angueira and reported "dissatisf[action] with all medical treatments to date." ECF No. 83-1, p. 1410. Shorter requested a recommendation and prescription for breast augmentation and orchiectomy and laser hair removal. Id. Dr. Angueira noted Shorter "had adverse effects from medical therapy, so surgical therapy is the only recourse to treat her properly at this time" and provided the prescriptions. Id., pp. 1410-13. On November 6, Shorter reported to Dr. Torres, that she felt "good" about visiting the endocrinologist because he recommended surgery and wrote a prescription for it. ECF No. 83-1, p. 1331. Shorter stated, "I don't understand why they just can't approve it. It's medically indicated and necessary." Id.

On December 8, Dr. Sabucedo noted that Lupron, Finasteride, and Spironolactone were stopped because Shorter "suffered some significant

side effects associated with these treatments such as anemia, hyperkalemia, tachycardia, chest pain . . . some acute kidney injury that may be related to medication and possible pre-renal azotemia d[ue] to high dose[s] [of] Spironolactone." Id., p. 1394. There is also a notation that Shorter has a past medical history of "hypertension, hyperlipidemia, bipolar disorder, depression and acute kidney injury." Id., p. 1396. Other conditions include glaucoma and prediabetes. Id., p. 1398.

On January 9, 2019, Shorter was seen at Larkin Community Hospital's cardiology department. ECF No. 83-1, p. 1388. The record notes that Lupron was held back because it caused palpitations and chest pains and there are "no known CAD or cardiac problems." Id.

Once released from prison, Shorter underwent full gender-affirming surgery (breast augmentation in July or August 2019 and "vaginoplasties" in February 2020) and restarted hormone therapy in May 2020. See Shorter's deposition, ECF No. 83-16, pp. 47, 129-33.

## V.    Legal Standard for Discrimination and Failure-to-Accommodate Claims

Section 504 of the Rehabilitation Act, nearly identical to the Americans with Disabilities Act (ADA)[12], provides: "No otherwise qualified individual with

---

[12] The ADA does not apply to federal agencies. See Dyrek v. Garvey, 334 F.3d 590, 597 n. 3 (7th Cir. 2003) (citing 42 U.S.C. § 12111(5)(B)).

a disability. . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). To state a claim under the RA, a plaintiff must allege: "(1) that [s]he is a qualified individual with a disability and (2) that [s]he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the [p]laintiff's disability."[13] Owens v. Sec'y, Fla. Dep't of Corr., 602 F. App'x 475, 477 (11th Cir. 2015) (quoting Bircoll v. Miami-Dade Cty., 480 F. 3d 1072, 1083 (11th Cir. 2007). Because the AG did not raise the issue of whether Shorter is a qualified individual with a disability, the Court will not address the first prong.

The RA does not require a prison to provide "the maximum accommodation or every conceivable accommodation possible." Stewart v. Happy Herman's Cheshire Bridge, 117 F.3d 1278, 1285 (11th Cir. 1997); see

---

[13] The elements of an ADA claim and RA claim are the same. See Cash v. Smith, 231 F.3d 1301, 1305 & n.2 (11th Cir. 2000) (superseded by statute on other grounds as stated in Seals v. Lee Brass Foundry, LLC, 271 F. Supp. 3d 1302, 1322 (N.D. Ala. 2017)). A plaintiff "can also show discriminatory intent under either statute by showing deliberate indifference under the Eighth Amendment." Liese v. Indian River Cty. Hosp. Dist., 701 F.3d 334, 345 (11th Cir. 2012). However, the Court dismissed the Eighth Amendment claims in this case; and Shorter did not assert an Eighth Amendment claim against the AG. ECF No. 94, pp. 2-3.

also Griffin v. United Parcel Serv., Inc., 661 F.3d 216, 224 (5th Cir. 2011) ("The ADA provides a right to reasonable accommodation, not to the [inmate's] preferred accommodation."); Bunn v. Khoury Enters., 753 F.3d 676, 682-83 (7th Cir. 2014) (a plaintiff is not entitled to the "exact accommodation" she "would have preferred."); McElwee v. Cty. of Orange, 700 F.3d 635, 641 (2d Cir. 2012) (a disabled individual is not entitled to "every accommodation he requests or the accommodation of his choice."). Accommodations do not need to be "optimal." There are a wide range of considerations in determining whether a requested accommodation is reasonable; and the burden is on the plaintiff to show the accommodation is reasonable on its face. U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 401 (2002); see also Schaw v. Habitat for Humanity of Citrus Cty., 958 F.3d 1259 (11th Cir. 2019). Neither the RA nor the Eighth Amendment require BOP to provide Shorter with her preferred course of treatment. As outlined below, Shorter's claims fail as a matter of law.

A. Shorter's Discrimination Claim Fails

Shorter argues that the denial of her "repeated requests and her physician's recommendations for surgery" amounts to discrimination. ECF No. 90, p. 33. Shorter suggests that BOP's "attempts to" provide "cosmetic"- or "drugstore solutions" are not actual treatments for her condition. Id., p. 34.

Apparently, according to Shorter, accommodations not prescribed by a physician would fail to satisfy the RA. Id., pp. 33-34. Shorter's argument amounts to a legal conclusion. She does not present any facts that suggest BOP denied her request for an orchiectomy or breast augmentation because she is transgender. In fact, BOP uses a multidisciplinary approach to address the needs of all transgender inmates, which may include surgery on a case-by-case basis. See "Medical Management of Transgender Inmates," ECF No. 87-25. Shorter's medical care was, particularly, conducted in accordance with sections "9. Hormone Treatment: Eligibility, Goals, Overview" and "10. Medications for MTF Individuals," See ECF No. 87-25, pp. 15-20. The criteria for gender-affirming surgery is outlined in section 12:

> Although individuals may live successfully as transgender persons without surgery, gender-affirming surgery may be appropriate for some and is considered on a case-by-case basis.
>
> . . . In addition to the eligibility and readiness criteria for hormone therapy, general criteria for consideration of surgery include at least 12 months of successful use of hormone therapy, participation in psychotherapy as clinically indicated, full-time[,] real life experience in their preferred gender, and consolidation of gender identity. The inmate must request consideration for and demonstrate via informed consent a practical understanding of gender-affirming surgery including, but not limited to, permanence, potential complications, and short- and long-term treatment plans.

> Requests for surgery are submitted to the BOP TCCT for
> initial review and recommendation to the Medical Director,
> who is the approving authority. . .

ECF No. 87-25, p. 23. Clearly, there are multiple factors to consider besides living as a woman for at least one year. Shorter complains that BOP should not have required her to accept a housing assignment at women's prison because she lived as a woman prior to incarceration. But this alone is insufficient to support a discrimination claim.

Here, Shorter did not report her gender dysphoria to BOP until two years into her sentence. For years during her incarceration Shorter denied the BOP's offers to house her in a female prison to give her the opportunity to live as a woman. With less than one year remaining on her sentence, Shorter agreed to a transfer to a women's prison. Moreover, Shorter did not want full gender reassignment from BOP. She never requested it and outright rejected the idea. Shorter's reasons for accepting some- and denying other accommodations (medical or non-medical) are certainly her own, but that will not transform BOP's offers into unreasonable accommodations. This seems particularly true when the medical community is divided on many issues relating to the treatment of gender dysphoria and when the guidelines for treatment "evolve" or "change." See Dr. Estes deposition, ECF No. 83-11, p. 11. Dr. Estes testified:

> When it comes to making permanent gender transition through surgery, we recommend an evaluation by mental health professionals. It's not a decision that the surgeon should necessarily make themselves. It's something that should be done by a team, by a consort of doctors to be sure that, yes, this is correct, this is the right thing to do for this patient.

Id. It makes sense then that a prescription or a recommendation for surgery alone is insufficient to warrant a stamp of approval. The decision for permanent, irreversible surgery would need to be made by a team, not by any one physician.

Shorter cannot show that she was "excluded from participation in or . . . denied the benefits of the services, programs, or activities" or was otherwise subjected to discrimination because of her disability. Contrary to Shorter's assertions, housing, restroom facilities, commissary products -- in addition to medical care -- all qualify as services, programs, or activities under the broad statutory definition.

The policies and protocol, specifically, BOP's "Medical Management of Transgender Inmates," apply to all BOP inmates with gender dysphoria; and, therefore, all similarly situated inmates are treated equally and obtain the benefits of the BOP programs in the same way. Shorter offers nothing to suggest she was treated differently from other transgender inmates or that BOP approved surgery for other transgender inmates yet denied her request.

It is worth noting that one of the criteria is "at least 12 months of successful use of hormone therapy." Yet, Shorter insisted during her incarceration and throughout this litigation that hormone therapy was not successful, so, surgery was her only option.

Shorter's argument that BOP should not have denied her surgery request because she was unable to acquire the consult letters is similarly unpersuasive. Dr. Estes (an outside provider) required the letters to make the referral for any surgery, not BOP. ECF No. 87-6, p. 3. BOP has no control over a private medical provider's requirements or procedures.

No policy kept Shorter from receiving surgical intervention simply because she is transgender. Shorter fails to show she was treated differently from other similarly situated inmates. Additionally, there are no facts to support an inference BOP took any adverse actions against Shorter because she is a transgender woman.[14] See Doe v. Pa. Dep't of Corr., 2021 U.S. Dist. LEXIS 31970, *37, 2021 WL 1583556 (W.D. Pa. Feb 19, 2021) (RA claims

---

[14] See Calloway v. Dunn, 2021 U.S. Dist. LEXIS 145992*, 2021 WL 3388655 (N.D. Ala. July 8, 2021) Report and Recommendation granting summary judgment adopted by Calloway v. Dunn, 2021 U.S. Dist. LEXIS 145007*, 2021 WL 3371041 (N.D. Ala. Aug. 3, 2021). Calloway, a transgender prisoner, sued prison officials under Section 1983, the ADA, and the RA when they approved some accommodations for her gender dysphoria but refused other accommodations. Calloway's discriminations claims failed because she alleged "no facts supporting an inference the defendants took any adverse actions against her because she is a transgender woman. Moreover, she has failed to state a deliberate indifference claim." Id.

survive motion to dismiss when plaintiff alleged other individuals including some transgender men were allowed to choose their own roommates) but see Olson v. Meyers, 2004 U.S. Dist. LEXIS 10440, 2004 WL 1280353, at *2 (N.D. III. June 7, 2004) (granting summary judgment when prisoner plaintiff gave no evidence of differential treatment or denial of reasonable accommodation because of diabetes).

Shorter's own account and the record supports a finding that BOP went to exceptional lengths to provide her with medical and non-medical accommodations. Shorter does not meet her burden of proof on the essential elements of a discrimination claim and failed to state a deliberate indifference claim in this case.

B. The Failure-to-Accommodate Claim Fails Because the Surgery is a Preferred Accommodation

The AG argued the failure-to-accommodate claim fails because BOP provided Shorter with numerous accommodations to address her gender dysphoria including breast forms, hair care products, women's underwear, single-cell housing accommodations at each institution where she was housed, exceptions for visual searches, private showers[15], the opportunity to

---

[15] Shower accommodations were made at Shorter's request. ECF No. 83-1, p. 1347.

transfer[16] to a female facility, psychological treatment, hormone treatment, and specialists outside the prison system. ECF No. 82, pp. 29-30. The denial of surgery did not result in the deterioration of Shorter's mental health. Id., p. 32.

According to Shorter, hormone therapy was not an option because of "her significant medical history including cancer and her own lumpectomy," and because "it did not work." ECF No. 90, pp. 33-34. Shorter does not deny that the treatments she did receive -- medical and non-medical -- were proper to address her medical condition, only that they were not enough. However, the record blatantly refutes Shorter's argument that an orchiectomy and breast augmentation was her only remaining medical option. Ultimately, the law does not require BOP to provide Shorter the accommodation of her choosing but only a *reasonable* accommodation.

Fears and concerns aside, Shorter served two years of her sentence before seeking hormone treatment from BOP and provided a list of the drugs and hormones she previously used for five years while "on the street."[17] ECF

---

[16] Shorter requested a transfer to a female facility on March 21, 2018. ECF No. 83-1, p. 1348.

[17] In 2007, Shorter was approximately twenty-nine years old at the time she began hormone treatments on her own; she continued her regimen until 2012 when she was incarcerated. She began wearing women's clothing at sixteen years old. See ECF Nos. 83-1, pp. 1, 5; 87-11, p. 2.

Nos. 87-10, p. 3; 87-11, p. 2. It was at Shorter's own request that BOP provided hormone therapy (including those she previously used). ECF No. 83-1, p. 133. BOP informed her of the risks of estrogen (heart attack, blood clots, stroke, breast pain, HA, etc), and carefully monitored her progress as narrated above. Id. Shorter's insistence for hormone treatment during incarceration is significant because it is contrary to her legal arguments, especially, when it is a regimen she resumed after release from prison.

Records confirm Shorter never had cancer. In April 2016, she reported a family history of breast cancer. ECF No. 83-1, p. 607. In August 2016, Shorter reported that, in May 2014, a sister died from breast cancer.[18] ECF No. 83-1, p. 584. On other occasions, she reported two sisters passed away from the same and there were "five family [members] right now who are battling cancer." ECF No. 83-1, pp. 454, 608. BOP arranged for testing. The lumpectomy -- a biopsy of Shorter's right breast -- was "[n]egative for malignancy, [p]ositive for lobular hyperplasia." ECF No. 83-1, p. 444. Some records indicate a prophylactic mastectomy would be performed, but no

---

[18] In July 2016, Shorter informed Dr. Skibinski her sister died from breast cancer, but no date for her death was noted at that time. ECF No. 83-1, p. 588.

mastectomy was *actually* performed in prison. ECF No. 83-1, pp. 443-44, 571, 579, 1000. In a medical record dated May 3, 2018, Dr. Alarcon noted:

1- Genetic test BRCA1 and BRCA2 reported 10-28-2016. No Mutation Detected.
2- Right Breast Incisional Biopsy reported 09-22-2016.
3- Benign breast tissue with florid lobular hyperplasia. Focal pseudo angiomatose stromal hyperplasia (PASH) and gynecomastoid changes. Negative for atypia or malignance

ECF No. 83-1, pp. 1249, 1252. From 2014, until Shorter developed a non-malignant lump, Shorter's medical records indicate some progress with hormone therapy although it was not optimal or as fast as Shorter wanted. ECF No. 83-1, p. 98. She was satisfied with certain accommodations but still wanted an orchiectomy and top surgery.[19] Shorter expressed to Dr. Alarcon in 2016, "I prefer castration instead of hormonal replacement therapy because, I know the side effect of the anti androgenic hormonal therapy . . . I don't see any breast enlargement . . . constantly use a fake breast, I want to have natural breasts." ECF No. 83-1, p. 483.

Dr. Angueire testified hormone therapy is a proper course of treatment. ECF No. 83-12. Eventually, estrogen would be increased to six milligrams

---

[19] For example, Shorter was "very satisfied" with the endocrinologist, was "satisfied" with BOP psychology services, and was "very happy" with Vaniqa for suppressing hair growth. ECF Nos. 83-1, pp. 599, 601; 87-6, p. 2. Shorter was able choose her breast forms from several options. ECF No. 83-1, p. 953.

daily over time to reduce the risk of blood clots. Id., pp. 16, 21. Dr. Angueira did not recommend surgery when first evaluating Shorter in 2016. "We recommended to start medical therapy or restart medical therapy first to see if we can get the patient happy with just the medical treatment and still consider the orchiectomy later." Id., p. 51. Dr. Angueira testified that "transgender patients require hormonal therapy"; and admitted there are multiple standards to consider "because there hasn't been a full consensus sometimes on how to do transitioning." ECF No. 83-12, pp. 9, 17. This is confirmed by Dr. Estes' testimony. ECF No. 83-11.

Dr. Angueira testified orchiectomy, psychiatric treatment, hormone therapy, vaginoplasty are all acceptable options for treatment of a male-to-female transgender person. Id., p. 57. Dr. Angueira admitted his written prescriptions for Shorter were to make it more obvious to BOP surgery was recommended. Id., pp. 58, 62. Dr. Angueira recommended surgery "would be the best way to go," but also admitted he is not a surgeon and could not answer what type of surgeon would be qualified to do it. ECF No. 83-12, pp. 37-39. Dr. Angueira further opined, "because [Shorter] could not take the estrogen . . . we recommended again . . . the patient needed the orchiectomy done." Id., p. 61.

Dr. Estes testified that surgery for Shorter, was:

> medically an option. These are surgeries that are
> performed by choice, And if . . . she felt that this was right
> for her, and if it was confirmed by mental health
> professionals that it would be a benefit psychologically for
> her, and she elected to proceed, yes, it was an acceptable
> choice to perform a gender transition for her.

ECF No. 83-11, p. 12.

The medical testimony and the record expose the flaw in Shorter's argument -- her current regimen after full gender reassignment includes six milligrams of estrogen. See Shorter's deposition, ECF No. 83-16, p. 9. Shorter can – and does -- take estrogen. Dr. Angueira testified, "usually when somebody has familiar breast cancer, even if we don't know the genetics or we don't know anything, we just assume that the risk is increased, and we don't recommend continuing estrogen therapy" but "the patient can choose to continue it." ECF No. 83-12, p. 27. Despite her fears and family history, Shorter chooses to continue an estrogen regimen at a dose six times higher than what she received during incarceration. See ECF No. 83-1, p. 121. The Court takes no position on whether Shorter's decisions reduce or increase her risk for breast cancer. Again, Shorter's choices are her own, but they do not transform surgical options into requirements under the law.

What is clear for the Court is that hormone therapy and surgery was -- and are -- options for Shorter. Surgery alone would not have eliminated Shorter's need for hormonal treatments – even if, as she claims, it "doesn't

work" and is "contraindicated." ECF No. 90, pp. 33-34. Moreover, Shorter asked BOP for more limited surgery. Shorter specifically informed BOP she did not want full reassignment surgery and would have it after her release. ECF No. 83-1, pp. 12, 220, 608. Shorter told Dr. Torres, "I'm not even asking for the full reassignment surgery because I don't trust BOP to do it right. I just want my testicles to be removed so I can stop the hormones." ECF No. 87-20, p. 4. Shorter testified she was asking for surgery because it was a "faster solution." ECF No. 83-1, p. 98. Furthermore, after leaving prison and deciding to undergo *full gender reassignment*, Shorter's demand for "payment for her surgery" and "economic losses" would require a finding that BOP is legally and financially responsible for surgeries she never requested. See Shorter's complaint at ECF No. 40, p. 30. Shorter's request was for a preferred accommodation. As a whole, the record cannot lead a rational trier of fact to find in Shorter's favor.

Accordingly, Shorter's failure to accommodate claims fail as a matter of law. She is simply not entitled to the accommodation of her choice. Even if Shorter could support a discrimination or failure-to-accommodate claim, she would not be entitled to monetary damages as explained in the next section.

## VI.   Remedies

Shorter is not entitled to compensatory damages for her claims under the Rehabilitation Act. Congress did not intend to waive the federal government's sovereign immunity against monetary damages awards for executive agencies' violations of the Rehabilitation Act. Lane v. Pena, 518 U.S. 187 (1996). However, the Rehabilitation Act has a fee shifting provision which allows a prevailing party in litigation to collect attorneys' fees. See H.C. v. Bradshaw, 426 F. Supp. 3d 1266, 1276 (S.D. Fla. Oct. 10, 2019) (citing 29 U.S.C. § 794a(b)). Specifically, § 794a(b) provides that "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." Id.

The threshold question is whether the petitioning plaintiff is a prevailing party. "A prevailing party must be one who has succeeded on any significant claim affording it some of the relief sought, either pendente lite or at the conclusion of the litigation." Texas State Teachers Ass'n v. Garland Indep. Sch. Dist., 489 U.S. 782, 791 (1989). "[A] plaintiff [must] receive at least some relief on the merits of his claim before he can be said to prevail." Hewitt v. Helms, 482 U.S. 755, 760 (1987).

A prevailing party "must (1) 'obtain actual relief, such as an enforceable judgment or a consent decree; (2) that materially alters the legal relationship

between the parties; and (3) modifies the defendant's behavior in a way that directly benefits the plaintiff at the time of the judgment or settlement.'" Salazar v. Maimon, 750 F.3d 514, 521 (5th Cir. 2014) (quoting Walker v. City of Mesquite, TX, 313 F.3d 246, 249 (5th Cir. 2002) (citing Farrar v. Hobby, 506 U.S. 103, 111-12 (1992)). However, there are "some circumstances, [when] even a plaintiff who formally prevails under § 1988 should receive no attorney's fees at all. A plaintiff who seeks compensatory damages but receives no more than nominal damages is often such a prevailing party." Gray v. Bostic, 720 F.3d 887, 893 (11th Cir. 2013) (internal quotations and citations omitted). "When a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary relief, the only reasonable fee is usually no fee at all." Id., quoting Farrar, 506 U.S. at 115. Necessarily, because Lane precludes a compensatory damages award, Shorter will fail to prove an essential element of her claim for relief. It follows then, while in other types of cases attorney's fees can be awarded at the court's discretion, here, even if Shorter prevailed, no fee may be awarded.

The only remedies available to a federal prisoner under the RA are declaratory and injunctive relief. Here, Shorter is no longer in BOP custody; so, there is no medical care or other accommodation BOP can provide

Shorter. At best, if Shorter did prevail, she could be entitled to declaratory relief.

## VII.   Conclusion and Recommendation

For the reasons stated, it is respectfully **RECOMMENDED** that Defendant's motion for summary judgment, ECF No. 82, be **GRANTED** because Shorter fails to satisfy the essential elements of her claims under the Rehabilitation Act as a matter of law, and that the case be **CLOSED**.

IN CHAMBERS at Tallahassee, Florida, on March 4, 2022.

**s/ Martin A. Fitzpatrick**
**MARTIN A. FITZPATRICK**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations. Fed. R. Civ. P. 72(b)(2). A copy of the objections shall be served upon all other parties. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Fed. R. Civ. P. 72(b)(2). Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control. If a party fails to object to the Magistrate Judge's findings or recommendations as to any particular claim or issue contained in this Report and Recommendation, that party waives the right to challenge on appeal the District Court's order based on the unobjected-to factual and legal conclusions. See 11th Cir. Rule 3-1; 28 U.S.C. § 636(b)(1)(C).